WILLCOX *et al.,* CONSTITUTING THE PUBLIC SERVICE COMMISSION OF NEW YORK, *v.* CONSOLIDATED GAS COMPANY.

CITY OF NEW YORK *v.* CONSOLIDATED GAS COMPANY OF NEW YORK.

JACKSON, ATTORNEY GENERAL OF THE STATE OF NEW YORK, *v.* CONSOLIDATED GAS COMPANY.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

Nos. 396, 397, 398.    Argued November 4, 5, 6, 1908.—Decided January 4, 1909.[1]—Opinion filed January 12, 1909.

It is not a question of discretion or comity for the Federal court to take jurisdiction of a case; it is the duty of that court to take jurisdiction when properly appealed to; and it should not be criticized for so doing even though the case be one of local interest. *Cohens* v. *Virginia,* 6 Wheat. 264, 404. The right of a party plaintiff to choose the

---

[1] On January 4, 1909, MR. JUSTICE PECKHAM made the following announcement:

First. At the time of the consolidation, the value of the franchises of the constituent companies was fixed by them at $7,781,000 and that amount formed part of the capital of the complainant for which it

Federal court cannot be properly denied. *Re Metropolitan Receivership,* 208 U. S. 90, ·110.

Rates, when fixed by legislative authority, for public service corporations, should allow a fair return upon the reasonable value of the property at the time it is being used, but the legislative act will not be

issued stock. The consolidation was effected pursuant to the state statute and the State has never questioned the validity or fairness of the valuation. Since the consolidation the stock so issued has been dealt in up to the present time as valid stock of the consolidated company, capitalized pursuant to the statute at not more than the fair aggregate value of the property, franchises and rights of its constituent companies. The State should not now be heard to question the value of the franchises at the time of the consolidation. The method of arriving at the value of these kinds of franchises, and how they should generally be tested in the fixing of rates, are questions not now before the court and are left undecided. The case before the court is decided upon its own peculiar facts.

Second. The estimated increase in the value of these franchises as made by the trial court at the time of the commencement of this suit is only an estimate and is not based upon evidence sufficient to warrant the finding of any increase whatever over the amount agreed upon at the consolidation.

Third. The evidence leaves it in doubt whether the value of the property used by the company in its business is as great as found by the trial court after reducing the value of the franchises to the sum agreed upon at consolidation.

Fourth. But taking the value as found by the court, after reducing the value of the franchises the result gives a return of almost 5½ per cent. A reduction in the value of the real estate, plants, etc., of a small amount only would bring the return to, if not more than 6 per cent. A possible increased consumption of gas would probably increase the earning of the company without a corresponding increase of cost. Under all the circumstances the complainant has failed to make out its case with that degree of clearness necessary to warrant the interference of a court of equity before an actual and *bona fide* test has been made under the practical operation of supplying gas at the rates mentioned in the statutes.

Fifth. There is no rule as to any particular rate which any corporation subject to legislative control in the matter has a right to obtain without legislative interference. It depends upon circumstances and locality. In this particular case with reference to the risk attending the business and the locality where it is carried on, the complainant

decla̱ d invalid by the courts unless the rates are so unreasonably low that their enforcement would amount to taking the property for public use without compensation.   *San Diego Land and Town Co. Cases,* 174 U. S. 739; 189 U. S. 439.

Except in very clear cases, courts should not interfere with state rate

is entitled to a return, if it is possible, of 6 per cent upon the fair value of its property actually used in its business of supplying gas.

Sixth. There is no discrimination between the individual consumer and the city, by fixing the price of gas for the city at five cents per thousand cubic feet less than is permitted in the case of individual consumers, so far at least as the complainant is concerned.   If the amount obtained from the total gas sold to the city and the individual is enough to secure the requisite return upon the property, it is all the complainant can require and the question of discrimination between city and individual is one in which the complainant can have no interest.

Seventh. The rate proposed must be with reference to the value of the property at the time when the rate takes effect.   The company is entitled to the benefit of any increase in value at that time.   This at least is the general rule, and if there be any exception to the rule, this case does not come within it.

Eighth. Any increased expense arising from the increased candle power of the light demanded by the statutes, was included substantially in the expenses of the year (1905) with reference to which the inquiry was made.

Ninth. The provision in the acts requiring a certain pressure is unconstitutional.   The proof unquestionably shows great possible if not probable danger of explosion in the mains or other pipes, if the pressure demanded were applied to them as they now are.   To eliminate such danger would require strengthening all the mains and other pipes, which would involve an expenditure of many millions of dollars upon which no return could be obtained at the rates prescribed by the acts. The provision can be separated, however, from the rest of the statute and the balance thereof made valid.   The pressure must be sufficient to produce a light of the candle power mentioned in the acts.

Tenth. If the court below is right in its construction of the penalties, as to their amount, etc., such penalties are void, but are separable from the rest of the acts and the balance can be effectually carried out.

Eleventh. This is not a case for the valuation of good will.   The complainant has in fact a substantial monopoly of the gas business in the city of New York and those who wish to use gas must take it from complainant.   In this case, as there is no possibility of competition there should be no allowance for good will.

legislation before the legislation goes into effect. *Knoxville* v. *Water Co., ante*, p. 1.

Value of the property employed being an essential element in determining whether a rate is or is not confiscatory, and being also largely a matter of opinion, where the determination of the question depends upon such value, a court of equity should hesitate to interfere by injunction to suspend the rate before it goes into operation and a fair trial has been made.

Franchises of public service corporations are property and cannot be taken or used by others without compensation, and, where a State has by legislative enactment permitted such corporations to capitalize such franchises, their value at the time of such capitalization should be included in the value of the property as an element for fixing rates; but no increased value of such franchises should be allowed.

Public service corporations, such as gas companies, are subject to the legislative right to fix rates which permit not more than a fair return on the property used.

Whether a rate yields such a fair return as not to be confiscatory depends upon circumstances, locality and risk, and no particular rate can be established for all cases.

Under all the circumstances of this case this court concurs with the court below that six per cent is a fair return on the value of property employed in supplying gas in the city of New York, and a rate yielding that return is not confiscatory.

In estimating value of franchises for the purpose of fixing rates, it is immaterial that the corporation is taxed on a greater value than that allowed if it charges its taxes as operating expenses in determining net income.

Where a public service corporation has a monopoly, such as of supplying gas in a large city, " good will " cannot be considered as an element of value of the property employed.

For purpose of fixing rates the value of property employed should be determined as of the time when the inquiry is made, and, as a general rule, the corporation is entitled to the benefit of increased value since acquisition.

Twelfth. As it may possibly be that a practical experience of the effect of the acts by actual operation under them might prevent the complainant from obtaining a fair and just return upon its property used in its business of supplying gas, the complainant, in that event, ought to have the opportunity of again presenting its case to the court. Therefore the decree is reversed with directions to dismiss the bill without prejudice.

A provision in a state statute, requiring a public service corporation to perform its service in such a manner that its entire plant would have to be rebuilt at a cost on which no return could be obtained at the rate fixed, deprives the company of its ability to secure such return and is unconstitutional and void.

*Ex parte Young*, 209 U. S. 123, followed as to the unconstitutionality of provisions in a state statute for penalties for violations so enormous as to be overwhelming.

Provisions in a gas rate bill for rate, pressure and penalties for violation, may be, as held in this case, separable and the unconstitutionality of the provisions as to pressure and penalties will not affect the provisions as to rate.

Provision in a gas rate act establishing one rate for the municipality and another for individual consumers is not an unreasonable classification and does not render the act unconstitutional under the equal protection clause of the Fourteenth Amendment.

Where none of the different classes of consumers complain of different rates the corporation cannot complain of such differences provided the total receipts are sufficient to yield an adequate return.

Where, as in this case, in an action brought before the rate takes effect, complainant fails to sustain the burden of clearly showing that a rate act is confiscatory, the bill should be dismissed without prejudice to right of the complainant to bring another action after the rate goes into effect if it then proves to be confiscatory.

So held in regard to the New York Eighty-Cent Gas Law.

157 Fed. Rep. 849, reversed.

THE appellee, complainant below, filed its bill May 1, 1906, in the United States Circuit Court for the Southern District of New York against the city of New York, the Attorney General of the State, the District Attorney of New York County and the Gas Commission of the State, to enjoin the enforcement of certain acts of the legislature of the State, as well as of an order made by the Gas Commission, February 23, 1906, to take effect May 1, 1906, relative to rates for gas in New York City.

Since the commencement of the suit the Gas Commission has been abolished and the Public Service Commission has been created by the legislature in its stead. The official term of Attorney General Mayer has also expired, and Attorney General Jackson, his successor, has been substituted in his place.

The ground for the relief asked for in the bill was the alleged unconstitutionality of the acts and the order, because the rates fixed were so low as to be confiscatory. Upon filing the bill a preliminary injunction was granted (146 Fed. Rep. 150), and after issue was joined the case was referred to one of the standing masters of the court to take testimony, in conformity to the practice indicated in *Railroad* v. *Tompkins,* 176 U. S. 167, 179.

A hearing was had before the master, who reported in favor of the complainant. The case then came before the Circuit Court, and, after argument, a final decree was entered, restraining defendants from enforcing the provisions of the acts and the order relating to rates or penalties. 157 Fed. Rep. 849. These various defendants, except the District Attorney, have taken separate appeals directly to this court from the decree so entered. The acts which are declared void as unconstitutional are chapter 736 of the Laws of 1905, which limits the price of gas sold to the city of New York to a sum not to exceed 75 cents per thousand cubic feet. The act also requires that the gas sold shall have a specified illuminating power, and a certain pressure at all distances from the place of manufacture. Penalties are attached to a violation of the act. The other act is chapter 125 of the Laws of 1906, limiting the prices of gas in the boroughs of Manhattan and the Bronx, to other consumers than the city of New York, to 80 cents per thousand cubic feet, with like penalties as in the act of 1905, and with the same provisions as to illuminating power and the pressure in the service mains. The order which was declared invalid was one made by the Gas Commission created under and by virtue of chapter 737 of the Laws of 1905, the order providing that the price of gas in the city should be not more than 80 cents to consumers other than the city of New York. The order had the same provisions as to illuminating power and pressure as the acts above mentioned. The master and the court below found that the 80-cent rate was so low as to amount to confiscation, and hence the acts and the order were invalid as in violation of the Federal Constitution.

*Mr. Edward B. Whitney*, with whom *Mr. George S. Coleman* was on the brief, for appellants Willcox *et al*:

A simple allegation that a statute is unconstitutional is no exception to the rule that equity can only be resorted to when there is no adequate remedy at law. *Cruickshank* v. *Bidwell*, 176 U. S. 73; *Indiana Manufacturing Co.* v. *Koehne*, 188 U. S. 681, 684. The suit cannot be maintained on the ground that it prevents multiplicity of actions, since no representative consumers were made parties, as in *Ex parte Young*, 209 U. S. 123, 129. See *Richman* v. *Consolidated Gas Co.*, 114 N. Y. App. Div. 216, 224; *S. C.*, 186 N. Y. 409. A statute should never if possible be construed so as to be unconstitutional or absurd. *Oates* v. *National Bank*, 100 U. S. 244; *Grenada County* v. *Brogden*, 112 U. S. 268. Penalty laws are strictly construed. *France* v. *United States*, 164 U. S. 676, 682; *Bolles* v. *Outing Co.*, 175 U. S. 262, 265; *United States* v. *One Bay Horse*, 128 Fed. Rep. 207. The penalty clause in this act was not properly construed by the court below, but as properly construed is reasonable. *Cox* v. *Paul*, 175 N. Y. 328; *Griffin* v. *Interurban Street Railway Co.*, 179 N. Y. 438, 448–449; *S. C.*, 180 N. Y. 538; see cases cited in *In re Snow*, 120 U. S. 286; *United States* v. *Patty*, 2 Fed. Rep. 664; *Armour Packing Co.* v. *United States*, 209 U. S. 56, 77; *United States* v. *Éagan*, 30 Fed. Rep. 498; *Taft* v. *Stephens Lithographic Co.*, 38 Fed. Rep. 28; *Creeps* v. *Durden*, Cowp. 640; *Central R. R. Co.* v. *Green*, 86 Pa. St. 427. Assuming equity to have had jurisdiction, it should have been declined and the controversy remitted to the state courts.

The 75-cent rate as to the city is not an unconstitutional discrimination. On the contrary, since the 75-cent statute was passed in 1905, and under it the complainant could still earn nearly ten per cent according to the Circuit Court figures, it was valid when enacted, and therefore could not be made invalid by the passage of a subsequent law, even if the latter were unconstitutional.

Under the rule laid down in *Sweet* v. *Rechel*, 159 U. S. 380,

392 (derived from Wellington, Petitioners, 16 Pick. 87, 96–97, and Talbot v. Hudson, 16 Gray, 417, 422), and the test laid down in San Diego Land Co. v. Jasper, 189 U. S. 439, 441–442, as between two unimpeached and qualified expert witnesses, the valuations most favorable to defendant must be adopted; a statute cannot be declared unconstitutional upon testimony of experts or employés (see Chicago & Grand Trunk Railway Co. v. Wellman, 143 U. S. 339), unless the State admits its correctness; complainant is entitled to no higher valuations than those which it has itself fixed under oath; and items incapable of exact valuation must be put down at the minimum amount that a fair minded state court could fix. At least as to all items of capitalization over and above the actual cost of the property, the test must be this: Is it logical or equitable that the consumer should pay more cents per thousand cubic feet of the gas he burns because of the inclusion of this item?

The period to which attention must be directed is the month of May, 1906, when the suit was begun. If conditions thereafter change, the remedy is under Smyth v. Ames, 169 U. S. 466, 549–550.

The basis of valuation of the land occupied by complainant's plants should not exceed its cost to the company. Of two gas companies, long established in the same community, neither should be permitted to charge a higher rate than the other to its consumers for the sole reason that, on account of movements of population uninfluenced by either company, the site of its plant would be the more valuable if vacated and sold. The fortunate company is entitled to obtain full value of the land when sold, but meanwhile the unrealized profit does not represent profit used in the manufacture and distribution of gas; it represents wealth which the manufacture and distribution of gas keeps out of use. But if the basis of valuation is to exceed the cost of the land it should still not exceed the estimated cost of replacing it with other land capable of accomplishing the same result.

The manufacturing plants should be valued not at what it would cost to reproduce them as they stand, but at what it would cost to produce a modern construction which could do the same amount of work. The complainant is estopped from disputing in such a case as this the valuation which it has itself given to the state tax officers and investigating committee.

The complainant is not entitled to any allowance of increased value over original cost of the pipes in the streets, due to the fact that the streets have been repaved with money raised by assessments upon the consumers; complainant being excused under the state law from paying assessments.

A franchise with, is to be distinguished from a franchise without, the right to charge a minimum toll or earn a minimum dividend. *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, belongs to the latter class (see original record in that case, pp. 33, 39, 50, 53, and brief for appellee therein). A revocable franchise is not entitled to be valued at a substantial sum. *Kingsland* v. *The Mayor*, 110 N. Y. 569, 583. The franchises claimed by complainant are either unconstitutional, or not complainant's property, or revocable immediately or upon short notice. Moreover, a franchise to build and operate, without any special contract guaranteeing a minimum rate, has no value cognizable in rate-making or condemnation proceedings except that it gives the company the valuable right to have its tangible assets valued as portions of a profitable going concern, instead of merely as a job lot of secondhand material. See *People ex rel. Metropolitan Street Railway Co.* v. *Tax Commissioners*, 174 N. Y. 417; *Brunswick Water District* v. *Maine Water Co.*, 99 Maine, 371, 375–381. Such a franchise must be construed as having been granted subject to the fixing of a reasonable maximum rate. There is an implied understanding that the tolls shall be high enough to give the company a fair return. A fair return on what? What would counsel advise a proposed purchaser about it, the day after the company opened for business? According to our contention it would be calculated upon the capital in-

vested. Moreover, the State can at any time authorize or direct the city to build its own lighting plant. If this be done, the company must drop its claim for a profit on its alleged franchise or lose all its customers. *Skaneateles Water Case*, 161 N. Y. 154; *S. C.*, 184 U. S. 354, and the *Newburyport Cases*, 168 Massachusetts, 541, 555; 103 Fed. Rep. 584; 193 U. S. 561.

The basis of the maximum rate regulation should not be a figure exceeding the capital actually invested. At the time of the granting of the franchise the implied understanding is that a reasonable return will be allowed upon the capital invested, in view of the special risk of the enterprise. If assured that the public will protect him to the extent of allowing him to make, if successful, a profit upon that investment proportionate to that risk, the investor will take it.

As to the rate of return, it has been already decided that six per cent, including an allowance for depreciation, is sufficient. *San Diego Co.* v. *Jasper*, 189 U. S. 439, 446. But it is submitted that property is not taken under the Fourteenth Amendment if the owner is allowed, over and above a proper contingent fund, a sum sufficient to cover the elements known in political economy as interest on capital and wages of superintendence; the element of insurance against the special risks of the business not being protected by the Fourteenth Amendment, but one as to which the responsibility is upon the State. Mill's Political Economy, Book I, Ch. 15, § 1; J. L. Laughlin's Elements of Political Economy, ed. 1902, pp. 202, 206; Marshall's Principles of Economy, Book VI, Ch. 6, §§ 4, 5. If complainant is entitled to six per cent upon any part of its investment, it is not so entitled as to the whole of the investment; for companies so situated could borrow in ordinary times at considerably lower rate to the extent of half the tangible property, nor is there evidence justifying the return at any particular rate upon the franchise item.

The bill should be dismissed because the experience of the other companies doing business in the same territory, as well

as of this complainant, should have been shown.  If one of two companies doing business in the same territory can make a reasonable profit at the statutory rate, then that rate is constitutional as to both companies, since to apply it to that company alone would violate its rights under the Fourteenth Amendment.  See *Gill Case*, 156 U. S. 657; *Cotting Case*, 183 U. S. 114.  Applying the same rate to the company less well equipped would not violate its rights, although it might force reconstruction, temporarily cutting off any return.  *Moeschen* v. *Tenement House Department*, 89 N. Y. App. Div. 526, 538; 179 N. Y. 325, 330; 203 U. S. 583.

Assuming that an injunction were proper in this case, it should have been conditioned upon complainant's reducing its charge for gas to whatever sum would be deemed constitutional.  1 Pomeroy's Eq. Jurispr., §§ 385–386, 389, 393; *De Walsh* v. *Braman*, 160 Illinois, 415, 420; see also *Veazie* v. *Williams*, 8 How. 134, 161; *Willard* v. *Tayloe*, 8 Wall. 557, 567; *People's Bank* v. *Marye*, 191 U. S. 272, 281, 285, and cases cited; *S. C.*, 3 Dill. 19, 34; *Farmers' Loan & Trust Co.* v. *Denver Co.*, 126 Fed. Rep. 46, 51; *Thomas* v. *Evans*, 105 N. Y. 601, 615; *Fanning* v. *Dunham*, 5 Johns. Ch. 122, 142, and cases cited; *Stanly* v. *Gadsby*, 10 Pet. 521; *Tiffany* v. *Boatman's Inst.*, 18 Wall. 375, 385; *Knoth* v. *Manhattan Railway Cot*, 109 App. Div. 802, 807, affirmed 187 N. Y. 243.

*Mr. Alton B. Parker*, with whom *Mr. Francis K. Pendleton* and *Mr. William P. Burr* were on the brief, for the city of New York, appellant in No. 397:

The court below erred in assigning to the franchises acquired by the appellee under the consolidation agreement a money value as part of the investment on which it is entitled to a return.  It was solely on the finding by the court of a value of $12,000,000 for these franchises that the court decreed the enactments to be unconstitutional in respect of the rates fixed. Whatever monetary value might, for any purpose, be assigned to these franchises, it disappears when the rate of charge for

service is so reduced as to yield no more than a fair and reasonable return on the investment in the means employed in rendering the service; the court having found $47,831,435 as the value of the tangible assets employed by the appellee, and six per cent to be a reasonable return, and that the return the appellee would probably realize at the reduced rate would be $3,024,592.45, which is more than six per cent on the valuation so found—the court erred in adding to that valuation $12,000,000 for franchises, thus increasing the investment to $59,831,435, on which the probable return would be less than six per cent, though the return would even then be reasonable.

The court below erred in assigning to the tangible assets any value in excess of their original cost to the constituent corporations of the appellee and the cost of any additions thereto since 1884, the time of consolidation. The entire cost of the real estate employed in its business by the appellee was only $4,118,267.38 as against $11,985,435 allowed by the decree, being a difference of $7,867,167.62, which, being deducted from the total valuation of $47,831,435, would reduce that total to $39,964,268.38, on which the return of $3,024,592.45 would be more than seven per cent. Further, if the valuation for franchises be excluded, whether we take original cost to constituent corporations, or appraised valuation by the constituent corporations in 1884 for the purposes of consolidation and additions thereto since then, or even present values as found by the master and approved by the court, the result is the same; the net return of $3,024,592.45 exceeds six per centum; when the item franchises, valued by the corporations in 1884 at $7,781,000, and not separately valued by the master, but increased by the court, through a process of reasoning, to $12,000,000 is added that even then the return is over five per centum. And further, $5,555,761.63 has been unwarrantably added for reproductive cost of mains and services and deducting this sum and the excessive allowance for real estate from the total found by the court, the

return to the appellee on its investment would be more than eight per cent.

The return of six per cent adopted by the court, is more than a fair return to the appellee, that is more than is usually obtained or expected from equally safe investments.

The finding of the court as to the impossibility of the appellee fulfilling the requirement as to pressure in its mains is predicated of the erroneous valuations of the property of the appellee, and these being corrected the appellee would be able to make the requisite changes and still have a fair return; and the requirement is separable from the other provisions.

The legislation complained of is not unjustly discriminatory; the discrimination is just and reasonable, the city standing in the relation of a wholesale consumer or buyer; the cost of supplying the city is greatly less than the cost of supplying other consumers; and the difference of five cents per thousand feet in favor of the city when spread over the entire sales of the appellee results in a difference of only fifteen one-hundreths of a cent per thousand feet in favor of the city.

The appellee has an adequate defense at law against proceedings to enforce performance of any of the provisions of the statute, if they are not enforcible, and, by injunction, against the separable provisions for penalties.

*Mr. William S. Jackson,* Attorney General of the State of New York, for appellant in No. 398:

The evidence fails to show that it was impossible for the legislature fair-mindedly to come to the results reached.

The legislative acts were based upon evidence presented by complainant.

The legislative acts were invalidated by improper methods of valuation, involving property not entitled to a return, gross over-valuations and duplications. For purposes of rate regulation, neither franchise nor good-will can be valued separately from tangible property. The valuation of franchises and good-will would nullify the State's power to reduce rates

once established. But that power has been upheld by this court in *Stanislaus County* v. *San Joaquin C. & I. Co.*, 192 U. S. 213, 214.

The owner is entitled to a return only upon the fair value of the property necessary for the particular use. *Covington & Lexington Co.* v. *Sandford*, 164 U. S. 578. For there may "have been extravagant and needless expenditure of money" in construction; it may have been invested in a plant "unwisely built." *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362; "it may have been invested in property that cost more than it should have cost." *San Diego L. & T. Co.* v. *National City*, 174 U. S. 739. "Great mistakes of construction, even though honest, may have been made, which unnecessarily enhance the cost; more property may have been acquired than necessary and needful for the purpose intended." *Stanislaus County* v. *San Joaquin C. & I. Co.*, 192 U. S. 201; and "reckless and unnecessary expenditures, not legitimately incurred in the acquisition, construction or preservation of so much of the plant as is necessary for the purpose, may have been made." *San Diego City Co.* v. *City of San Diego*, 62 Am. St. Rep. 273. The question of reasonableness of a rate involves the element of reasonableness both as regards the company and as regards the public. *Chicago &c. R. R.* v. *Minnesota*, 134 U. S. 450; *Turnpike Co.* v. *Sandford*, 164 U. S. 578.

The rate fixed must be just to the public as well as to the public service corporation. *San Diego Land Co.* v. *National City*, 174 U. S. 757; *San Diego Land & Town Co.* v. *Jasper*, 189 U. S. 442; *Turnpike Co.* v. *Sandford*, 164 U. S. 578; *Smyth* v. *Ames*, 169 U. S. 546.

The State has the right to secure to the public the benefits of the advancement in the particular science affected by the law, and its power so to do is not to be restricted by the employment of obsolete apparatus or the use of methods which that particular science has long since discarded. *Gill Case*, 156 U. S. 657.

The 80-cent rate will be held to yield complainant a fair

return unless it is plainly and palpably confiscatory. *Chicago &c.* v. *Wellman*, 143 U. S. 339, 444; *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362, 391; *Smyth* v. *Ames*, 169 U. S. 466, 529; *Henderson Bridge Co.* v. *Henderson City*, 173 U. S. 592, 614, 615; *San Diego Land Co.* v. *National City*, 174 U. S. 739, 754; *San Diego Land Co.* v. *Jasper*, 189 U. S. 439; *Ball* v. *Rutland R. R. Co.*, 93 Fed. Rep. 19; *Palatka Waterworks* v. *Palatka*, 127 Fed. Rep. 161.

The maximum rate fixed by chapter 125 of the Laws of 1906, will permit complainant to earn a fair return upon the property employed by it in its gas business.

A statute which permits a public service corporation to earn a return of five and five-tenths (5.5) per cent per annum upon investment in constantly appreciating realty, in plant and property in the streets protected against depreciation, and upon intangible property, which is constantly appreciating in value, does not constitute confiscation of that property.

The provisions as to candle power, pressure and penalties do not invalidate the acts and they are separable. *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362, 394–396; *Consolidated Gas Co.* v. *Mayer*, 146 Fed. Rep. 155.

The eleven-cent allowance by the court was excessive.

We submit that all this allowance in excess of 7.70 cents for current repairs and replacements is excessive. The 7.70-cent charge keeps the plant at all times presently efficient. The average for twenty years has been 10.89 cents, and the development of the capacity under that average shows that it was much more than necessary for the purpose now pretended. *Cedar Rapids Water Co.* v. *Cedar Rapids*, 199 U. S. 600.

*Mr. James M. Beck, Mr. John A. Garver* and *Mr. Charles F. Matthewson* for appellee:

*Mr. Beck:* In the statutes here in question the provisions as to pressure are unconstitutional, and invalidate both statutes. The undisputed and indisputable conclusions from the testimony upon this point are:

Assuming that compliance with the pressure provisions was at all practicable, it would involve the expenditure of at least $4,000,000, a substantial increase in operating charges and a reconstruction of the company's distributing system throughout the city; such compliance was physically impossible before the act became operative and the penalties for non-compliance accrued; nor could such increased fixed charges and operating expenses be incurred under the eighty-cent gas rate, and leave a fair return.

The penalties for failure to comply would aggregate at $5,000 per day, $1,800,000 per year under complainant's distributing system as now existing and in operation.

The subjects of price, quality and pressure are so interwoven in these statutes that the requirements as to pressure cannot be severed from the other provisions so that the court can reasonably believe that the legislature would have enacted the provisions as to price and candle power with the provision as to pressure eliminated, and this being so, the whole scheme of legislation is invalidated. The legislative history of the statutes plainly shows the interdependence of the provisions.

This court is under no obligation to determine for the legislature which of two impossible alternatives is to be eliminated. *Non constat* that the legislature may not prefer to retain the old maximum price of $1 to enable the complainant to reconstruct its plant; *non constat* that it may not prefer to repeal the provisions as to pressure in order that the price of gas may be reduced.

The cases cited by counsel for appellants upon the question of severability do not sustain their contentions. *Pollock* v. *Loan Co.*, 158 U. S. 601; *Employer's Liability Cases*, 207 U. S. 463, 501; *Field* v. *Clark*, 143 U. S. 649; *McPherson* v. *Blacker*, 146 U. S. 1; *Baldwin* v. *Franks*, 120 U. S. 685; *Huntington* v. *Worthing*, 120 U. S. 97; *Allen* v. *Louisiana*, 103 U. S. 80, discussed and distinguished.

The severability of different portions of a statute is a question of construction, and in this case a New York statute

should be construed by New York decisions under which the pressure provision is not severable from the body of the statute. See *People* v. *Porter,* 90 N. Y. 68; *Trustees Saratoga Springs* v. *Gas Co.,* 191 N. Y. 123.

The provisions of said acts as to penalties are unconstitutional on their face and invalidate both statutes. Such penalties operate as a denial of the equal protection of the laws. *Cotting* v. *Stockyards Co.,* 183 U. S. 79; *Ex parte Young,* 209 U. S. 123; *Chicago Ry. Co.* v. *Minnesota,* 134 U. S. 418.

Both statutes are unduly discriminatory, and therefore unconstitutional upon their face.

This corporation has, as every one has, the liberty of contract guaranteed by the Fourteenth Amendment. *Lochner* v. *New York,* 198 U. S. 53; *Allgeyer* v. *Louisiana,* 165 U. S. 589. The State, therefore, has no general and unlimited right to interfere between the producer and the consumer as to the price upon which they would otherwise mutually agree, and while, as to public utility corporations the supervisory power of the State, subject to the guarantees of the Constitution, has been recognized since *Munn* v. *Illinois,* yet the State, when it seeks to interfere with the rights of property and the liberty of the citizen to contract for the sale of the products of his labor, only has power to prevent extortion by maximum charges of general and uniform application.

Under the police power to regulate rates, the State is without power to direct a public utility corporation to sell to one customer at a less price than to another. Its power to step between the public service corporation and its customers is exhausted when it fixes a general and uniform maximum price for the public service. *Lake Shore R. R. Co.* v. *Smith,* 173 U. S. 684. See also *Wilson* v. *United Traction Co.,* 72 App. Div. 233; *Beardsley* v. *Railroad Co.,* 162 N. Y. 230.

The rate fixing power is one of prohibition. In strictness, it does not fix rates, but simply provides that any sum beyond a given maximum is unreasonable. In so doing, it in effect declares that the maximum is a reasonable price. *Brooklyn*

*Union Gas Co.* v. *New York*, 188 N. Y. 334; *Lake Shore Ry. Co.* v. *Smith*, 173 U. S. 684, 695.

When, therefore, the State provides that as to all other consumers, 80 cents per thousand feet is a reasonable charge, and provides that, as to one consumer, no greater charge than 75 cents shall be made, it in effect declares that to the favored consumer gas must be sold at less than a reasonable rate. This the State cannot do.

The finding of the Circuit Court that the rates prescribed would yield the complainant less than a just and reasonable rate of return is a finding of fact and not a conclusion of law, and this court should therefore give to such finding the controlling weight of a special verdict of a jury and not reverse such finding except for clear and indubitable error. *Turnpike Co.* v. *Kentucky*, 164 U. S. 578; *C., M. & St. P. R. R. Co.* v. *Tompkins*, 176 U. S. 167; *Davis* v. *Schwartz*, 155 U. S. 631, 636; 1 Foster's Fed. Prac., § 315, p. 690; *Green* v. *Bishop*, 1 Cliff. 186, 194; *Mason* v. *Crosby*, 3 Woodb. & Minn. 258, 269; *Donnell* v. *Columbia Ins. Co.*, 2 Sumn. 366, 371; *Welling* v. *La Bau*, 34 Fed. Rep. 40; *Moline Plow Co.* v. *Carson*, 72 Fed. Rep. 387, 388; *Fidelity &c. Co.* v. *St. Matthew's Savings Bank*, 104 Fed. Rep. 858, 860; *Paddock* v. *Commercial Ins. Co.*, 104 Massachusetts, 521, 531; *Richards* v. *Todd*, 127 Massachusetts, 167, 172; *Penna. R. R. Co.* v. *Philadelphia County*, 220 Pa. St. 100.

The Fourteenth Amendment invalidates a rate if it yield less than just remuneration, even though it yield some return. *Cotting* v. *Stockyards Co.*, 183 U. S. 91; *Railroad Commission Cases*, 116 U. S. 307; *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, 326; *Munn* v. *Illinois* (dissenting opinion of Field, J.), 94 U. S. 141; *Chicago R. R. Co.* v. *Minnesota*, 134 U. S. 418, 458; *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362, 397; *Smyth* v. *Ames*, 169 U. S. 466; *San Diego Land Co.* v. *National City*, 174 U. S. 739; *Minneapolis R. R. Co.* v. *Minnesota*, 186 U. S. 257; *Atlantic Coast Line R. R. Co.* v. *N. C. Corp. Com.*, 206 U. S. 1.

A composite statement of this court, therefore, is that legis-

lative rates, to be constitutional, must yield a "compensation" that is "full," "fair," "just," "reasonable" and "adequate" and one that is not less than the "market value" of such use.

The rule that the fair return must not be less than the legal rate of interest is justified on reason and authority. *Brunswick Water District* v. *Maine Water Co.,* Beale and Wyman on R. R. Rate Regulation, § 401; *Brymer* v. *Water Co.,* 179 Pa. St. 251; *Pennsylvania R. R. Co.* v. *Philadelphia County,* 220 Pa. St. 100, 115; *Chicago Union Traction Co.* v. *State,* 114 Fed. Rep. 557, 561; *Louisville Ry. Co.* v. *Brown,* 123 Fed. Rep. 946; *Central R. R. of Ga.* v. *Alabama,* 161 Fed. Rep. 925; *Milwaukee Ry. & Light Co.* v. *Milwaukee,* 87 Fed. Rep. 577; *Southern Pacific R. R. Co.* v. *Commonwealth,* 78 Fed. Rep. 236; *Spring Valley Water Works* v. *San Francisco,* 124 Fed. Rep. 598; *Bridge Co.* v. *Canada Southern Ry.,* 7 Ont. App. 226.

The basis of calculation should be the present value of the property and not its original cost. *San Diego Land Co.* v. *National City,* 174 U. S. 739, 757; *Cotting* v. *Stockyards Co.,* 183 U. S. 79, 91; *Smyth* v. *Ames,* 169 U. S. 547; *San Diego Land Co.* v. *Jasper,* 189 U. S. 439, 442; *Stanislaus County* v. *Irrigation Co.,* 192 U. S. 201, 215; *Cotting* v. *Kansas City Stockyards Co.,* 82 Fed. Rep. 850, 854.

*Mr. Garver:* Special franchises must be included among the assets upon which the company is entitled to a return. The special franchises which are involved in the case at bar are the identical franchises which were under consideration by this court in the Special Franchise Tax Cases. *Metropolitan Street Ry. Co.* v. *New York,* 199 U. S. 1, affirming 174 N. Y. 417; *Consolidated Gas Co.* v. *New York,* 199 U. S. 53.

The law of New York controls as to nature of special franchises. *Ohio Oil Co.* v. *Indiana,* 177 U. S. 190, 205, 207; *Muhlker* v. *Harlem R. R. Co.,* 197 U. S. 544; *Vicksburg* v. *Vicksburg Water Works Co.,* 206 U. S. 496, 509.

In New York, special franchises are property in the fullest sense. *Sixth Ave. R. Co.* v. *Kerr,* 72 N. Y. 330; *People* v. *O'Brien,*

111 N. Y. 1; 40; *Suburban Rapid Transit Co.* v. *New York*, 128 N. Y. 510, 520; *People ex rel. Woodhaven Gas Co.* v. *Deehan*, 153 N. Y. 528, 532; *Parker* v. *Elmira, C. & N. R. Co.*, 165 N. Y. 274; *People* v. *Tax Commissioners*, 174 N. Y. 417, 437; *Matter of White Plains Commissioners*, 176 N. Y. 239; *Matter of Long Acre El. L. & P. Co.*, 188 N. Y. 361; *Hatfield* v. *Straus*, 189 N. Y. 208, 219; *Coney Island &c. R. Co.* v. *Kennedy*, 15 App. Div. 588, 592; *Rochester &c. Turnpike Road Co.* v. *Joel*, 41 App. Div. 43, 45; *Wakefield* v. *Village of Theresa*, 125 App. Div. 38.

A corporation cannot be deprived of its special franchises, except under the power of eminent domain and upon payment of their full value. *Sixth Ave. R. Co.* v. *Kerr*, 72 N. Y. 330; *Matter of White Plains Commissioners*, 176 N. Y. 239; *Coney Island &c. R. Co.* v. *Kennedy*, 15 App. Div. 588, 592; *Spring Valley Water Works* v. *San Francisco*, 124 Fed. Rep. 574; *Monongahela Nav. Co.* v. *United States*, 148 U. S. 312.

While the point has not been directly passed upon by this court, yet, wherever it has been referred to in the general discussion of the subject of rate regulation, it has been stated or assumed that, in fixing a rate, the value of the special franchises must be included in valuing the property of a public service corporation. *Smyth* v. *Ames*, 169 U. S. 466; *Reagan* v. *Farmers' L. & T. Co.*, 154 U. S. 362; *Chicago &c. Ry. Co.* v. *Tompkins*, 176 U. S. 167; *Detroit* v. *Detroit Citizens' St. Ry. Co.*, 184 U. S. 368.

In addition to the fact that these franchises are regarded as "property in the highest sense," in New York there are some special considerations which would make it peculiarly flagrant for the legislature of that State to disregard them, in establishing a maximum rate for a public service corporation, and particularly for the appellee. *People* v. *O'Brien*, 111 N. Y. 1, 40.

In New York, special franchises are assessed for the purposes of taxation, under a special statute passed for that purpose. Laws 1899, Ch. 412; *People* v. *Tax Commissioners*, 174 N. Y.

417, 437. The right to capitalize special franchises has been recognized by the law of New York. Laws 1907, Ch. 429, §§ 55, 69. The capitalization of special franchises was expressly sanctioned in 1884. Laws 1884, Ch. 367.

An unconditional grant by a State constitutes a contract, which is entitled to protection under the Constitution just as fully as a grant made by an individual. *Fletcher* v. *Peck*, 6 Cranch, 87; *Sinking Fund Cases*, 99 U. S. 700, 719; *New Orleans Water Works Co.* v. *Rivers*, 115 U. S. 674, 681; *People* v. *O'Brien*, 111 N. Y. 1.

Good will should have been included among the assets upon the value of which the company was entitled to a return. Good will is a valuable property right, growing out of the successful establishment of a business, over and above the actual capital invested and employed in the business. *Franchises Tax Cases*, 174 N. Y. 417, 424; *Gue* v. *Tidewater Canal Co.*, 24 How. 261; *State R. R. Tax Cases*, 92 U. S. 575, 606; *Slater* v. *Slater*, 175 N. Y. 143; *Matter of White Plains Commissioners*, 176 N. Y. 239; *People* v. *Roberts*, 154 N. Y. 101; *Cleveland &c. Ry. Co.* v. *Backus*, 154 U. S. 439; *Express Company Cases*, 166 U. S. 171, 185; *Western Union Tel. Co.* v. *Gottlieb*, 190 U. S. 412; *Fargo* v. *Hart*, 193 U. S. 490; *San Francisco Bank* v. *Dodge*, 197 U. S. 70.

*Mr. Matthewson* dealt exclusively with the facts in the cases.

By leave of court, *Mr. W. Bourke Cockran*, representing certain interested parties, and *Mr. Nathan Matthews*, representing the complainant in the case of *Haverhill Gas Light Company* v. *Barker*, pending in U. S. Circuit Court for the District of Massachusetts, filed briefs herein, as *amici curiæ*.

MR. JUSTICE PECKHAM, after making the foregoing statement, delivered the opinion of the court.

At the outset it seems to us proper to notice the views regarding the action of the court below, which have been stated

by counsel for the appellants, the Public Service Commission, in their brief in this court. They assume to criticise that court for taking jurisdiction of this case, as precipitate, as if it were a question of discretion or comity, whether or not that court should have heard the case. On the contrary, there was no discretion or comity about it. When a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction (*Cohens* v. *Virginia,* 6 Wheat. 264, 404), and in taking it that court cannot be truthfully spoken of as precipitate in its conduct. That the case may be one of local interest only is entirely immaterial, so long as the parties are citizens of different States or a question is involved which by law brings the case within the jurisdiction of a Federal court. The right of a party plaintiff to choose a Federal court where there is a choice cannot be properly denied. *In re Metropolitan Railway Receivership,* 208 U. S. 90–110; *Prentis* v. *Atlantic Coast Line et al.,* 211 U. S. 210. In the latter case it was said that a plaintiff could not be forbidden to try the facts upon which his right to relief is based before a court of his own choice, if otherwise competent. It is true an application for an injunction was denied in that case because the plaintiff should in our opinion have taken the appeal allowed him by the law of Virginia while the rate of fare in litigation was still at the legislative stage, so as to make it absolutely certain that the officials of the State would try to establish and enforce an unconstitutional rule.

The case before us is not like that. It involves the constitutionality, with reference to the Federal Constitution, of two acts of the legislature of New York, and it is one over which the Circuit Court undoubtedly had jurisdiction under the act of Congress, and its action in taking and hearing the case cannot be the subject of proper criticism.

An examination of the record herein, with reference to the questions involved in the merits, shows that the act under which the Gas Commission was appointed was subsequently to the commencement and trial of this suit, declared, on grounds

not here material, to be unconstitutional by the Court of Appeals of New York. 191 N. Y. 123, February 18, 1908. The order made by the commission must therefore be regarded as invalid. It is not important in this case, because the act of the legislature of 1906, makes the same provision as to the price of gas to consumers other than the city that the order does. We have as remaining to be considered the above-mentioned two acts of the legislature.

The question arising is as to the validity of the acts limiting the rates for gas to the prices therein stated. The rule by which to determine the question is pretty well established in this court. The rates must be plainly unreasonable to the extent that their enforcement would be equivalent to the taking of property for public use without such compensation as under the circumstances is just both to the owner and the public. There must be a fair return upon the reasonable value of the property at the time it is being used for the public. *San Diego Land & Town Company* v. *National City*, 174 U. S. 739, 757; *Same* v. *Jasper*, 189 U. S. 439, 442.

Many of the cases are cited in *Knoxville* v. *Water Co.*, just decided, *ante*, p. 1. The case must be a clear one before the courts ought to be asked to interfere with state legislation upon the subject of rates, especially before there has been any actual experience of the practical result of such rates. In this case the rates have not been enforced as yet, because the bill herein was filed and an injunction obtained restraining their enforcement before they came into actual operation.

In order to determine the rate of return upon the reasonable value of the property at the time it is being used for the public, it, of course, becomes necessary to ascertain what that value is. A very great amount of evidence was taken before the master upon that subject, which is included in five large volumes of the record. Valuations by expert witnesses were given as to the value of the real estate owned by the complainant, and as to the value of the mains, service pipes, plants, meters and miscellaneous personal property.

The value of real estate and plant is to a considerable extent matter of opinion, and the same may be said of personal estate when not based upon the actual cost of material and construction. Deterioration of the value of the plant, mains, and pipes is also to some extent based upon opinion. All these matters make questions of value somewhat uncertain; while added to this is an alleged prospective loss of income from a reduced rate, a matter also of much uncertainty, depending upon the extent of the reduction and the probable increased consumption, and we have a problem as to the character of a rate which is difficult to answer without a practical test from actual operation of the rate. Of course, there may be cases where the rate is so low, upon any reasonable basis of valuation, that there can be no just doubt as to its confiscatory nature, and in that event there should be no hesitation in so deciding and in enjoining its enforcement without waiting for the damage which must inevitably accompany the operation of the business under the objectionable rate. But where the rate complained of shows in any event a very narrow line of division between possible confiscation and proper regulation, as based upon the value of the property found by the court below, and the division depends upon opinions as to value, which differ considerably among the witnesses, and also upon the results in the future of operating under the rate objected to, so that the material fact of value is left in much doubt, a court of equity ought not to interfere by injunction before a fair trial has been made of continuing the business under that rate. and thus eliminating, as far as is possible, the doubt arising from opinions as opposed to facts.

A short history of the complainant, as to its incorporation and its capital, and the method by which the value of its franchises was arrived at, will render the further examination of the case more intelligible.

Prior to 1884 there were seven gaslight companies in New York City, each operated under separate charters, granted at different times between the years 1823 and 1865 or 1871. They

each had the right to use the streets of certain portions of the
city for the purpose of laying their mains and service pipes in
order to furnish gas to the city and the citizens.  Not one of
the companies had ever been called upon to pay a penny for
such right, but the grant to each was in that aspect a gratuity.
It was not, at the time of granting franchises such as these, the
custom to pay for them.

In 1884, by chapter 367 of the laws of that year, authority
to consolidate manufacturing corporations was granted upon
conditions mentioned in the act.  The directors of the corpo-
rations proposing to consolidate were to make an agreement
for consolidation, embracing, among other things, the amount
of capital and the number of shares of stock into which it
should be divided, the capital not to be in amount more "than
the fair aggregate value of the property, franchises and rights
of the several companies to be consolidated."  The agreement
was not to be valid until submitted to the stockholders of each
of the companies and approved by two-thirds of each.  The
constituent companies, which were afterwards consolidated un-
der their agreement, and pursuant to the act mentioned, were
six in number, the seventh, the Mutual Company, withdrawing.
The companies agreed upon the valuation of their property,
which was to be paid for in the stock of the consolidated com-
pany, and the original stock held by the stockholders of each
company was surrendered to the consolidated company.  The
value of the franchises of all the companies was set at the
figure of $7,781,000.  The court below said that the master re-
ported there was little direct evidence before him as to the
value of the franchises, to which the court added that if the
master, by direct evidence, meant testimony of the same kind
regarding their value as had been offered regarding every item
of tangible property, there was none at all.

The court further stated "that it does not appear in the evi-
dence how the valuation of the franchises was measured, or
why the figures selected were chosen, but that it was true that
when complainant was organized, in 1884, under the consolida-

tion statute, which in terms permitted it to acquire the property and franchises of the other companies, it issued stock of the par value of $7,781,000, representing the franchises it then acquired and nothing else, and that the stock was held by purchasers, who, I am compelled to think, had a right to rely upon legal protection for legally issued stock." It is not, of course, contended there was special stock issued for this particular item, but it was included in the total sum for which the consolidated company issued its stock and upon its receipt the stockholders in the various companies surrendered their stock in those companies. The result was that the amount of the stock issued by the consolidated company was increased by $7,781,000, representing a value of franchises which was agreed upon by the stockholders in the companies. and which had never cost any of them a single penny.

It cannot be disputed that franchises of this nature are property and cannot be taken or used by others without compensation. *Monongahela Co.* v. *United States,* 148 U. S. 312; *People* v. *O'Brien,* 111 N. Y. 1, and cases cited. The important question is always one of value. Taking their value in this case as arrived at by agreement of their owners, at the time of the consolidation, that value has been increased by the finding of the court below to the sum of $12,000,000 at the time of the commencement of this suit. The trial court said: "If, however, complainant's franchises were worth $7,781,000 in 1884, and its tangible property, at the same time, was appraised (as appears in evidence), at $30,000,000 (in round figures), then since complainant's business (in sales volume) has, in twenty-three years, almost quadrupled, and its tangible assets grown to $47,000,000, it appears to me that a fair method of fixing value of the franchises in 1905 is to assume the same growth in value for the franchises as is demonstrated by the evidence in the case of tangible property. If, therefore, the franchise valuation of 1884 was proportioned to personalty and realty of $30,000,000, a franchise valuation proportioned to $47,000,000 in 1905 would be over $12,000,000. This, I think, a logical re-

sult from the assumption I am compelled to start with, *i. e.*, that franchises have a separate and independent value. But there is, however, no method of valuing franchises, except by a consideration of earnings; earnings must be proportioned to assets; and both kinds of assets, tangible and intangible, must stand upon the same plane of valuation; having, therefore, a measure of growth of tangible assets from 1884 to 1905, the franchise assets must be assumed to have grown in the same proportion. I find that the value of complainant's franchises at the date of inquiry was not less than $12,000,000, making a total valuation of $59,000,000, upon which the probable return is $3,030,000, or very considerably less than .6 per cent." The judge stated his own views as opposed to including these franchises in the property upon the value of which a return is to be calculated in fixing the amount of rates, but held that he was bound by decided cases to hold against his personal views.

We are not prepared to hold with the court below as to the increased value which it attributes to the franchises. It is not only too much a matter of pure speculation, but we think it is also opposed to the principle upon which such valuation should be made. This corporation is one of that class which is subject to regulation by the legislature in the matter of rates, provided they are not made so low as to be confiscatory. The franchises granted the various companies and held by complainant consisted in the right to open the streets of the city and lay down mains and use them to supply gas, subject to the legislative right to so regulate the price for the gas as to permit not more than a fair return (regard being had to the risk of the business) upon the reasonable value of the property at the time it is being used for the public.

The evidence shows that from their creation, down to the consolidation in 1884, these companies had been free from legislative regulation upon the amount of the rates to be charged for gas. They had been most prosperous and had divided very large earnings in the shape of dividends to their stockholders, dividends which are characterized by the Senate committee,

appointed in 1885 to investigate the facts surrounding the consolidation, as enormous. The report of that committee shows that several of the companies had averaged, from their creation, dividends over sixteen per cent, and the six companies in the year 1884 paid a dividend upon capital which had been increased by earnings, as in the case of the Manhattan and the New York, of eighteen per cent, and, had it been upon the money actually paid in, it would have been nearly twenty-five per cent.

The committee also said in the same report that these "franchises were in force November 10, 1884, the time of the consolidation, and the money invested in them was earning the same enormous dividends. So far as the evidence shows, there was nothing in the condition of affairs on the 10th of November to indicate that these franchises would not be as valuable for the next twenty years as they had been in the past. There were gas companies enough in the city with a capacity capable of supplying the demands for the next twenty years. A law was on our statute books that virtually prohibited the laying of any more gas pipes in the streets. The gas companies had an agreement among themselves, fixing the price of gas at a figure that paid these dividends. The people were paying this price, as they had in the past, without objection or protest. This price may have been too high, and the dividends were excessive, but they were not illegal, and the valuation of the franchises computed upon these dividends, and that state of facts cannot be called a violation of a law that expressly authorized it to be done, unless such valuation was too high."

The committee, upon these facts, were of opinion that the valuation of $7,781,000 for the franchises was not more than their fair aggregate value.

Assuming, as the committee did, that the company would be permitted to charge the same prices in the future which in the past had resulted in these "enormous" or "excessive" dividends, it need not be matter of surprise that a franchise by

means of which such dividends had been possible was not regarded as overvalued at the sum stated in 1884.

We think that under the above facts the courts ought to accept the valuation of the franchises fixed and agreed upon under the act of 1884 as conclusive at that time. The valuation was provided for in the act, which was followed by the companies, and the agreement regarding it has been always recognized as valid, and the stock has been largely dealt in for more than twenty years past on the basis of the validity of the valuation and of the stock issued by the company.

But although the State ought, for these reasons, to be bound to recognize the value agreed upon in 1884 as part of the property upon which a reasonable return can be demanded, we do not think an increase in that valuation ought to be allowed upon the theory suggested by the court below. Because the amount of gas supplied has increased to the extent stated, and the other and tangible property of the corporations has increased so largely in value, is not, as it seems to us, any reason for attributing a like proportional increase in the value of the franchises. Real estate may have increased in value very largely, as also the personal property, without any necessary increase in the value of the franchises. Its past value was founded upon the opportunity of obtaining these enormous and excessive returns upon the property of the company, without legislative interference with the price for the supply of gas, but that immunity for the future was, of course, uncertain, and the moment it ceased and the legislature reduced the earnings to a reasonable sum the great value of the franchises would be at once and unfavorably affected, but how much so it is not possible for us now to see. The value would most certainly not increase. The question of the regulation of rates did from time to time thereafter arise in the legislature, and finally culminated in these acts which were in existence when the court below found this increased value of the franchises. We cannot, in any view of the case, concur in that finding.

This increase in value did, however, form part of the sum upon which the court below held the complainant was entitled to a return. That court found the value of the tangible assets actually employed at the time of the commencement of this suit in the business of supplying gas by the complainant to be $47,831,435, to which it added the $12,000,000 as the value of the franchises as found by it, making the total of $59,831,435, upon which it held that the company was entitled to a return of 6 per cent, being $3,589,886.10. It also found its total net income for the year 1905 amounted to $5,881,192.45, almost 10 per cent upon the sum above named. Altering the finding of the court so far only as to place the value of the franchises at the time agreed upon in 1884, $7,781,000, the total value upon that basis of the property employed by the company would be $55,612,435, upon which 6 per cent would be $3,336,746.10, while the sum, estimated as the return on 80 cent gas would have been $3,024,592.14, which is nearly 5½ per cent on the above total of $55,612,435.

What has been said herein regarding the value of the franchises in this case has been necessarily founded upon its own peculiar facts, and the decision thereon can form no precedent in regard to the valuation of franchises generally, where the facts are not similar to those in the case before us. We simply accept the sum named as the value under the circumstances stated.

There is no particular rate of compensation which must in all cases and in all parts of the country be regarded as sufficient for capital invested in business enterprises. Such compensation must depend greatly upon circumstances and locality; among other things, the amount of risk in the business is a most important factor, as well as the locality where the business is conducted and the rate expected and usually realized there upon investments of a somewhat similar nature with regard to the risk attending them. There may be other matters which in some cases might also be properly taken into account in determining the rate which an investor might properly expect

or hope to receive and which he would be entitled to without legislative interference. The less risk, the less right to any unusual returns upon the investments. One who invests his money in a business of a somewhat hazardous character is very properly held to have the right to a larger return without legislative interference, than can be obtained from an investment in Government bonds or other perfectly safe security. The man that invested in gas stock in 1823 had a right to look for and obtain, if possible, a much greater rate upon his investment than he who invested in such property in the city of New York years after the risk and danger involved had been almost entirely eliminated.

In an investment in a gas company, such as complainant's, the risk is reduced almost to a minimum. It is a corporation, which in fact, as the court below remarks, monopolizes the gas service of the largest city in America, and is secure against competition under the circumstances in which it is placed, because it is a proposition almost unthinkable that the city of New York would, for purposes of making competition, permit the streets of the city to be again torn up in order to allow the mains of another company to be laid all through them to supply gas which the present company can adequately supply. And, so far as it is given us to look into the future, it seems as certain as anything of such a nature can be, that the demand for gas will increase, and, at the reduced price, increase to a considerable extent. An interest in such a business is as near a safe and secure investment as can be imagined with regard to any private manufacturing business, although it is recognized at the same time that there is a possible element of risk, even in such a business. The court below regarded it as the most favorably situated gas business in America, and added that all gas business is inherently subject to many of the vicissitudes of manufacturing. Under the circumstances, the court held that a rate which would permit a return of six per cent would be enough to avoid the charge of confiscation, and for the reason that a return of such an amount was the return ordinarily

sought and obtained on investments of that degree of safety in the city of New York.

Taking all facts into consideration, we concur with the court below on this question, and think complainant is entitled to six per cent on the fair value of its property devoted to the public use. But assuming that the company is entitled to six per cent upon the value of its property actually used for the public, the total value fixed by the court below is, as we have seen, much too large. We must first strike out the increased value of the franchises asserted by the court over the amount agreed upon in 1884, when the companies were consolidated. We also find that the total value of the tangible property is made up of several items, two of which are—

Real estate. .............................. $11,985,435
Plants. ................................. 15,000,000

Both depend largely upon the opinions of expert witnesses as to the value of that kind of property. Where a large amount of the total value of a mass of different properties consists in the value of real estate, which is only ascertained by the varying opinions of expert witnesses, and where the opinions of the plaintiffs' witnesses differ quite radically from those of the defendants', it is apparent that the total value must necessarily be more or less in doubt. It, in other words, becomes matter of speculation or conjecture to a great extent. It may be, as already suggested, that in many cases the rates objected to might be so low that there could be no reasonable doubt of their inadequacy upon any fair estimate of the value of the property. In such event the enforcement of the rates should be enjoined even in a case where the value of the property depends upon the value to be assigned to real estate by the evidence of experts. But there may be other cases where the evidence as to the probable result of the rates in controversy would show they were so nearly adequate that nothing but a practical test could satisfy the doubt as to their sufficiency.

In this case a slight reduction in the estimated value of the real estate, plants and mains, as given by the witnesses for

complainant, would give a six per cent·return upon the total value of the property as above stated. And again, increased consumption at the lower rate might result in increased earnings, as the cost of furnishing the gas would not increase in proportion to the increased amount of gas furnished.

The elevated railroads in New York when first built charged ten cents for each passenger, but when the rate was reduced to five cents it is common knowledge that their receipts were not cut in two, but that from increased·patronage the earnings increased from year to year, and soon surpassed the highest sum ever received upon the ten cent rate.

Of course, there is always a point below which a rate could not be reduced and at the same time permit the proper return on the value of the property, but it is equally true that a reduction in rates will not always reduce the net earnings, but on ·the contrary may increase them. The question of how much an increased consumption under a less rate will increase the earnings of complainant, if at all, at a cost not proportioned to the former cost, can be answered only by a practical test. In such a case as this, where the other data upon which the computation of the rate of return must be based, are from the evidence so uncertain, and where the margin between possible confiscation and valid regulation is so narrow we cannot say there is no fair or just doubt about the truth of the allegation that the rates are insufficient.

The complainant also contends ·that the State having taxed it upon·its franchises cannot be heard to deny their existence· or their value as taxed.

The fact that the State has taxed the company upon its franchises at a greater value than is awarded them here, is not material. Those taxes, even if founded upon an erroneous valuation, were properly treated by the company ·as part of its operating expenses, to be paid out of its earnings before the net amount could be arrived· at applicable·to dividends, and if such latter sums were not sufficient to permit the proper return on the property. used by the company for the public,

then the rate would be inadequate. The future assessment of
the value of the franchises, it is presumed, will be much lessened
if it is seen that the great profits upon which that value was
based are largely reduced by legislative action. In that way
the consumer will be benefited by paying a reduced sum (al-
though indirectly) for taxes.

We are also of opinion that it is not a case for a valuation of
"good will." The master combined the franchise value with
that of good will, and estimated the total value at $20,000,000.

The complainant has a monoply in fact, and a consumer must
take gas from it or go without. He will resort to the "old
stand," because he cannot get gas anywhere else. The court
below excluded that item, and we concur in that action.

And we concur with the court below in holding that the
value of the property is to be determined as of the time when
the inquiry is made regarding the rates. If the property, which
legally enters into the consideration of the question of rates,
has increased in value since it was acquired, the company is
entitled to the benefit of such increase. This is, at any rate,
the general rule. We do not say there may not possibly be an
exception to it, where the property may have increased so enor-
mously in value as to render a rate permitting a reasonable re-
turn upon such increased value unjust to the public. How such
facts should be treated is not a question now before us, as this
case does not present it. We refer to the matter only for the
purpose of stating that the decision herein does not prevent an
inquiry into the question when, if ever, it should be necessarily
presented.

The matter of the increased cost of the gas, resulting from
the provisions of the acts, as to making the gas equal to 22
candle-power, is also alleged as a reason for inadequacy of
rate.

It appears that the average candle-power actually produced
in the first six months of the year 1905 was 22, while but 20
candle-power was exacted by law, and for the last six months
of that year, while 22 candle-power was exacted, the average

amount was 24.19. This expense was included in the operating expense of that year, which resulted in the net earnings above mentioned, while the company was complying with the requirements of the act in this particular.

It is unnecessary, therefore, to further inquire as to the additional expense caused by this requirement.

Again, it has been asserted that the laws are unconstitutional, because of the provision as to pressure, and also by reason of the penalties which a violation of the acts may render a corporation liable to.

The acts provide that the pressure of the gas in the service mains at any distance from the place of manufacture shall not be less than one inch nor more than two and a half inches.

The evidence shows that to put a pressure such as is demanded by the acts upon the mains and other service pipes in their present condition would be to run a great risk of explosion, and consequent disaster. Before compliance with this provision would be safe the mains and other pipes would have to be strengthened throughout their whole extent, and at an expenditure of many millions of dollars, from which no return could be obtained at the rates provided in the acts. This would take from the complainant the ability to secure the return to which it is entitled upon its property, used for supplying gas, and the provision as to the amount of pressure is therefore void. This particular duty imposed by the acts is, however, clearly separable from the enactments as to rates, and we have no doubt that the remainder of the statute would have been enacted, even with that provision omitted.

The obligation would remain upon the company to have a pressure sufficient to insure a light of 22 candle-power, as provided in the acts.

We are of the same opinion as to the penalties provided for a violation of the acts. They are not a necessary or inseparable part of the acts, without which they would not have been passed. If these provisions as to penalties have been properly construed by the court below, they are undoubtedly void,

within the principle decided in *Ex parte Young*, 209 U. S. 123, and the cases there cited, because so enormous and overwhelming in their amount.

When the objectionable part of a statute is eliminated, if the balance is valid and capable of being carried out, and if the court can conclude it would have been enacted if that portion which is illegal had been omitted, the remainder of the statute thus treated is good. *Reagan* v. *Trust Co.*, 154 U. S. 362, 395; *Berea College* v. *Commonwealth of Kentucky*, 211 U. S. 45, 54. This is a familiar principle.

Lastly, it is objected that there is an illegal discrimination as between the city and the consumers individually. We see no discrimination which is illegal or for which good reasons could not be given. But neither the city nor the consumers are finding any fault with it, and the only interest of the complainant in the question is to find out whether, by the reduced price to the city, the complainant is upon the whole unable to realize a return sufficient to comply with what it has the right to demand. What we have already said applies to the facts now in question.

We cannot see from the whole evidence that the price fixed for gas supplied to the city by the wholesale, so to speak, would so reduce the profits from the total of the gas supplied as to thereby render such total profits insufficient as a return upon the property used by the complainant. So long as the total is enough to furnish such return it is not important that with relation to some customers the price is not enough. *Minneapolis &c.* v. *Minnesota,* 186 U. S. 257; *Atlantic Coast Line* v. *North Carolina Commission*, 206 U. S. 1.

Upon a careful consideration of the case before us we are of opinion that the complainant has failed to sustain the burden cast upon it of showing beyond any just or fair doubt that the acts of the legislature of the State of New York are in fact confiscatory.

It may possibly be, however, that a practical experience of the effect of the acts by actual operation under them might

prevent the complainant from obtaining a fair return, as already described, and in that event complainant ought to have the opportunity of again presenting its case to the court. To that end we reverse the decree, with directions to dismiss the bill without prejudice, and ·

*It is so ordered.*