PHILADELPHIA & R. RY. CO. et al. v. INTERSTATE COMMERCE
COMMISSION.

(Circuit Court, E. D. Pennsylvania.   November 20. 1909.)

1. COMMERCE (§ 98*) — ORDERS OF INTERSTATE COMMERCE COMMISSION FIXING
   RATES—REVIEW BY COURTS.

   A court having no constitutional power to regulate commerce or to fix
   rates to be charged by a carrier cannot suspend or vacate an order of
   the Interstate Commerce Commission prescribing rates under the power
   conferred by section 15 of the interstate commerce act as amended by Act
   June 29, 1906, c. 3591, § 4, 34 Stat. 589 (U. S. Comp. St. Supp. 1909, p.
   1158), except on the ground that in making such order the commission
   transcended its power or exercised such power without due regard to law
   and in violation of some legal, constitutional or natural right of the car-
   riers affected.

   [Ed. Note.—For other cases, see Commerce. Dec. Dig. § 98.*]

2. CARRIERS (§ 32*)—PREFERENCES IN INTERSTATE RATES—JUSTIFICATION.

   The similarity of circumstances and conditions under which a service of
   carriage is rendered, which, under the interstate commerce act, requires
   an equality of rate, relates to the circumstances and conditions which af-
   fect the service only, and, where different coal mining localities are
   grouped into a district for rate-making purposes, a carrier is not justified
   in making a different rate for the same or substantially similar service
   from a particular locality in such district, or on the product of a partic-
   ular mine or vein, from that charged others because the difference in the
   product from such locality mine or vein and that from other mines in the
   district is such that it can pay a higher rate and still compete in the
   market.

   [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 83–85; Dec. Dig.
   § 32.*

   What constitutes an unlawful preference or discrimination by a carrier
   under interstate commerce regulations, see note to Gamble-Robinson Com-
   mission Co. v. Chicago & N. W. Ry. Co., 94 C. C. A. 230.]

In Equity. Suit by the Philadelphia & Reading Railway Company,
the Baltimore & Ohio Railroad Company, Benjamin F. Bush, receiver
of the Western Maryland Railroad Company, the Pennsylvania Rail-
road Company, the Cumberland Valley Railroad Company, and the
Lehigh & New England Railroad Company, against the Interstate
Commerce Commission.   On demurrer to bill.   Demurrer sustained.

Charles Heebner and Hugh L. Bond, Jr. (George Stuart Patterson,
of counsel, for Pennsylvania R. Co.), for complainants.

J. Whitaker Thompson, U. S. Atty., and Luther M. Walter, Sp.
Asst. U. S. Atty., for Interstate Commerce Commission.

Before GRAY, BUFFINGTON, and LANNING, Circuit Judges.

BUFFINGTON, Circuit Judge.   This is a bill brought by the Bal-
timore & Ohio Railroad Company and a number of other railroad com-
panies against the Interstate Commerce Commission, to enjoin the
latter from enforcing its order of June 7, 1909, whereby it established
a tariff rate on Big Vein coal carried from the George's Creek and
Elk River regions in Maryland to coast points in other states.   To this
bill the Commission demurred.   The questions pertinent to our disposi-

tion of the case may be considered under the first and fifth grounds of demurrer, which are:

"(1) That it appears from the face of said bill: That all of the proceedings required by statute to be taken were duly taken and had; that after a formal complaint and answer a full hearing was had; that the Commission arrived at its conclusion after being fully advised; that the order complained of was duly given, made, rendered, and served; and that the conclusion of said Commission was not arbitrary or reached through fraud; and therefore the act of the defendant is final and conclusive and not reviewable by the courts."

"(5) That it appears from the face of the bill of complain: that the order of the Commission is lawfully issuable under the act to regulate commerce."

By section 15 of the interstate commerce law (Act Feb. 4, 1887, c. 104, 24 Stat. 384 [U. S. Comp. St. 1901, p. 3165]), as amended by Act June 29, 1906, c. 3591, § 4, 34 Stat. 589 (U. S. Comp. St. Supp. 1909, p. 1158), Congress empowered the Commission, if it "shall be of the opinion that any of the rates or charges whatsoever, demanded, charged, or collected by any common carrier or carriers, subject to the provisions of this act, * * * are unjust or unreasonable, or unjustly discriminatory, or unduly preferential or prejudicial, * * * to determine and prescribe what will be the just and reasonable rate or rates, charge or charges, to be thereafter observed in such case as the maximum to be charged."

The jurisdiction of the court in this case is invoked under section 15, which provides that the Commission's order may "be suspended or set aside by a court of competent jurisdiction," and section 16, which designates the particular court to exercise jurisdiction and provides that "jurisdiction to hear and determine such suits is hereby vested." Now the power conferred being to suspend or set aside the Commission's order, the question arises in what way and to what extent will this court exercise its powers in order "to hear and determine such suits"? Without referring to that general jurisdiction which federal courts, within constitutional limits, necessarily have to prevent infractions of the law, we note that the jurisdiction here invoked is conferred by the statute above quoted, and its purpose is to submit the action of an executive branch of the government to the judgment of the court that it may hear and determine such suit with a view to suspending or setting aside that action. On the argument counsel did not question the right of the Commission under the act to fix maximum rates, provided they were not confiscatory.

Now manifestly courts have no power to fix rates. Maximum Rate Cases, 167 U. S. 499, 17 Sup. Ct. 896, 42 L. Ed. 243; Gordon v. United States, 117 U. S. 697, 20 Sup. Ct. 1020, 44 L. Ed. 1219; Reagan v. Farmers' Loan & Trust Co., 154 U. S. 397, 14 Sup. Ct. 1047, 38 L. Ed. 1014. No such authority is conferred on federal courts by the Constitution, and by its grant to Congress of the power "to regulate commerce * * * among the several states," and "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers," the exercise of power to regulate commerce is restricted to that agency. The fixing of rates as an incident to the regulation of commerce, being a nonjudicial function, it follows that when

the legislative branch has itself acted therein, or by proper delegation of its powers has acted through the executive branch, such action, provided no legal, constitutional, or natural right has been violated, is not to be suspended or vacated by a court.

In pursuance of the powers above referred to, the Commission has made such an order in the premises, and that order is now in force unless it "be suspended or set aside by a court of competent jurisdiction." Now on what principles should this court proceed in suspending or setting aside an act of an independent branch of the government? Manifestly, the act is one of those administrative acts of the executive branch of the government, duly empowered thereto by the legislative branch, that falls within that category of which Mr. Justice Harlan spoke in the Union Bridge Case, 204 U. S. 386, 27 Sup. Ct. 374 (51 L. Ed. 523):

"If the principle for which the defendant contends received our approval, the conclusion could not be avoided that executive officers, in all departments, in carrying out the will of Congress, as expressed in statutes enacted by it, have, from the foundation of the national government, exercised and are now exercising powers, as to mere details, that are strictly legislative or judicial in their nature. This will be apparent from an examination of the various statutes that confer authority upon executive departments in respect of the enforcement of the laws of the United States. Indeed, it is not too much to say that a denial to Congress of the right, under the Constitution, to delegate the power to determine some fact or the state of things upon which the enforcement of its enactment depends would be 'to stop the wheels of government' and bring about confusion, if not paralysis, in the conduct of the public business."

It is therefore apparent that, when the question of suspending or setting aside an executive act comes before a court under such statute, the question is one of law, namely, whether the executive transcended its power or exercised such power without due regard to law. If, for example, there was a failure to comply with statutory requisites of notice, or to afford a statutory hearing, or the action taken was confiscatory—these are all elements a court might consider and in exercising such jurisdiction inquire into the facts to ascertain the real subject involved as throwing light upon the lawful or unlawful character of the order under review. The principles affecting this exercise of jurisdiction are clearly set forth by Judge Lanning in Appleby v. Cluss (C. C.) 160 Fed. 984, where, on a bill to enjoin execution of a fraud order made by the Postmaster General, he said:

"A due regard for an order of an executive department of the government demands that the judicial department shall not require the head of that executive department, or any of his subordinate officials, to answer a bill in equity, the purpose of which is to secure a decree which in effect annuls the order, unless the bill makes a clear prima facie case that the facts adduced before the executive department could not possibly support the order, or that the complainant's legal or constitutional rights have been violated."

This view is in accord with the principles set forth in San Diego v. National City, 174 U. S. 739, 19 Sup. Ct. 804, 43 L. Ed. 1154, and cases cited, viz.: Spring Valley v. San Francisco, 82 Cal. 286, 22 Pac. 910, 1046, 6 L. R. A. 756, 16 Am. St. Rep. 116; Chicago v. Wellman, 143 U. S. 339, 12 Sup. Ct. 400, 36 L. Ed. 176; Reagan v. Farmers' Loan, 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1031; Smyth v.

174 F.—44

Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819; Henderson v. Henderson, 173 U. S. 592, 19 Sup. Ct. 553, 43 L. Ed. 823; Missouri Co. v. Interstate Commerce Commission (C. C.) 164 Fed. 645; Knoxville Water Case, 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371; Consolidated Gas Case, 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382.

In the present case all the provisions of the statute were observed, and the parties concerned were duly notified and fully heard. It is, however, averred in the bill that the Commission "based its finding that the rates on the Big Vein coal, when consigned over the lines of your orators to Baltimore, Wilmington, and Philadelphia for transshipment by vessel, were unreasonable and unjustly discriminatory, wholly upon the ground that by reason of the higher cost of production of the said Big Vein coal it could not, when so consigned, successfully compete with the coals of the Pocahontas and New River districts."

Assuming, for present purposes, that, if this conclusion were correct, the Commission could not legally base an order on that ground, analysis discloses not only that the pleadings have not brought before us all the facts and proofs on which the Commission acted, but that those which are before us show that the conclusion stated above is not warranted, and that the Commission based its action on other and different grounds. To that end we address ourselves to the facts. The rate here in question applies to the transportation of coal mined from the Big Vein in the George's Creek and Elk Garden region, which we will hereafter refer to as the "George's Creek basin." For the purpose of rating, these two fields and the Somerset (which the Commission refers to as the Pennsylvania) field to the north and west, and the Austen-Newburg (which the Commission refers to as the West Virginia) field, to the west, were included in one group and had been so grouped for ten years. Thus, in their report in the present case and annexed to the bill, the Commission says:

"Rates from George's Creek basin and from the Pennsylvania and West Virginia fields are the same when the coal is destined for track delivery on the lines of the principal defendants; that is to say, coal from mines in the Pennsylvania and West Virginia fields takes the same rate as coal from the George's Creek basin when it is destined for local consumption even at tide water points. This is still the relation of the rates on coal from the three fields when destined to local points on the Baltimore & Ohio and Western Maryland. The three fields have been thus grouped for ten years or more. Moreover, Philadelphia, Wilmington, and Baltimore and intermediate points, at the other end of the haul, have for a like period of time also been grouped together under one rate for track delivery."

On all the coal carried from the mines in this group for track delivery to Philadelphia, Wilmington, and Baltimore the rate was $1.60 per ton, and for overpier delivery for shipment inside the Chesapeake and Delaware Capes the rate was $1.35 per ton. When it came, however, to overpier deliveries for shipment beyond the Capes, the George's Creek basin coals were charged a materially higher rate than the West Virginia and Pennsylvania fields, although all were in the same group, and the George's Creek had a shorter and downgrade haul as compared with the longer and upmountain grade to Cumberland in the case of the West Virginia and Pennsylvania fields. Now the effect

of the present order is to put all the coal from the group on an exact equality of $1.60 per ton for track deliveries, $1.35 for overpier deliveries for shipment inside the Capes, and $1.18 for overpier deliveries at Baltimore, and $1.25 at Philadelphia, for shipment outside the Capes.

The reason why shippers submitted to these varying prior rates in the same grouping is quite plain. The coal in the Pennsylvania and West Virginia fields of the group was ordinary bituminous coal and was found in small veins, while that in the George's Creek basin came from the "Big Vein," a stratum of such unusual thickness that it was mined at far less cost than the thinner veins, while its high grade and peculiar characteristics gave it a market of its own in which no other coal competed. Of this condition the Commission say in their report:

"The defendants the Baltimore & Ohio and the Western Maryland reach three coal districts, which for convenience are referred to in the report as the Pennsylvania, West Virginia, and George's Creek fields. Under an adjustment made in 1900, which was then entirely satisfactory to all concerned, these three fields were grouped together and took the same rate on coal destined for track delivery at points on the lines of those two roads. At that time the output of George's Creek basin consisted of Big Vein coal only, and it was concededly superior in quality to the coals mined in the other two districts. * * * The record showed that there was no competition from outside coal fields at local points on those lines; but when the coal went over the piers at Philadelphia, Baltimore, and Curtis Bay, for destination inside and outside the two Capes, it met the more or less severe competition of water-borne coal from mines on the Chesapeake & Ohio, Norfolk & Western, Pennsylvania, and the New York Central railroads. It was necessary therefore to shrink the rates in order to enable the coal from these three fields to enter those markets. Because, however, of the superior quality of George's Creek coal, and of its ability more easily to meet such competition, the rates on that coal were shrunk less than the rates on the coals from the Pennsylvania and West Virginia fields. The result of the adjustment was that, as compared with the rates from these fields, there was a differential of ten cents a ton against George's Creek coal when water-borne to competitive points inside the Capes, and of 15 cents a ton when destined to points outside the Capes."

Now to us it is clear that while a reduction by the railroad of their rates to the Pennsylvania and West Virginia fields was a proper business step, since otherwise the carrier would have had no traffic from those fields, yet it is equally clear that in the face of such reduction of rates to a part of the group the railroad had no legal right to retain the higher rate on the remainder of the group. The fact that the latter did not need the reduction to meet competition was no legal justification to warrant its retention. Speaking, in the recent case of Pennsylvania Railroad Company v. International Coal Mining Company (C. C. A.) 173 Fed. 3, of an attempt to justify different rates on coal hauled from the same grouping because one was "contract coal" and the other "free coal," we said:

"We are thus brought face to face with the question whether the existence of these contracts created a dissimilarity of circumstance and condition under which the service of carriage was rendered. To us the reading of the act is clear. The act contemplates 'compensation for any service rendered.' Now it is manifest that 'service rendered' is the physical service of carriage. Elsewhere it is spoken of as 'a like and contemporaneous service.' Such service is a 'service in the transportation'; it is a 'service in the transportation

of a like kind of 'traffic'; and it is a service in transportation 'under substantially similar circumstances and conditions.' The law having in view the carriage of freight and equal rates to all, it is clear to us that the words, 'substantially similar circumstances and conditions,' as used in this subsection, are those which affect transportation, and not those which involve personal conditions or contractual relations between one particular shipper and the carrier, but are such things only as are circumstances of carriage generally. In Wight v. United States, 167 U. S. 513, 17 Sup. Ct. 822, 42 L. Ed. 258, it was sought to differentiate the service performed by the different terminal facilities of the two shippers at their respective warehouses; but the court held these were not the circumstances and conditions of the act, but that the circumstances and conditions the act contemplated were those which affected the actual carriage of the freight, using this language: 'It was the purpose of this act to enforce equality between shippers, and it prohibits any rebate or other device by which two shippers, shipping over the same line, the same distance, under the same circumstances of carriage, are compelled to pay different prices therefor.' And that this phrase, 'circumstances of carriage,' was a carefully chosen one limiting the circumstances to such as affected haulage of freight is shown in Interstate Com. Com. v. Alabama, 168 U. S. 166, 18 Sup. Ct. 49 (42 L. Ed. 414), where, referring to Wight v. United States, supra, the court say: 'We there held that the phrase, "under substantially similar circumstances and conditions," as used in the second section (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3155]), refers to the matter of carriage, and does not include competition between rival routes.' It follows therefore that, if these circumstances and conditions of section 2 are those which affect haulage and do not include competition between rival routes, they do not include individual elements affecting individual shippers. The purpose of the section is to afford identity of rate for substantial identity of transportation service, and anything that does not aid in determining what is such substantial identity of haulage does not aid in the application of the section."

It will thus be seen that, while the nonuniform rate was continued as against George's Creek basin, there was no legal justification for such continuance. Later this matter came before the Commission in George's Creek Basin Coal Company v. B. & O. R. R. Co., 14 Interst. Com. R. 127, and of that case the present report says:

"In 1902, after this relation of rates as between the three fields had been in existence for about two years, the operators in George's Creek basin commenced for the first time to mine Small Vein coal, which as stated, is inferior in quality to the Big Vein coal, and is substantially the same as the coals mined in the Pennsylvania and West Virginia fields. But as the defendants in that proceeding made no distinction in their rates between Big Vein and Small Vein coal the latter, with differentials of 10 and 15 cents a ton against it, could not move by water in competition with coal of the same quality from the other two fields. The record in fact showed that, from the time the Small Vein mines were opened in 1902, to the time when the hearing of that complaint was had, not a single cargo of Small Vein coal was shipped to competitive points either inside or outside the Capes, although coal in large volume had reached those destinations from the other two fields. It was under these circumstances that the original complaint was filed asking for relief on behalf of the Small Vein operators. The complainants contended that the Small Vein coal, with differentials against it, could not successfully enter the markets for water-borne coal. No attack was made in the complaint on the inherent reasonableness of the rates from George's Creek basin to tide water points but only upon the reasonableness of those rates as applied to Small Vein coal when compared with the rates accorded to operators in the Pennsylvania and West Virginia fields. No complaint was made at that time either by or on behalf of the producers of Big Vein coal in George's Creek basin. On the contrary, the witnesses who testified gave us to understand that the Big Vein coal, because of its superior quality, had been able to hold its own under the existing rates in competition with the coals from the other

fields, and therefore required no reduction in order to retain its markets. We were, in fact, advised that the Big Vein coal had been so well and favorably known that it practically met with no competition at all from other bituminous coals except possibly from the New River coal on the Chesapeake & Ohio and the Pocahontas coal on the Norfolk & Western. Although it was quite unusual, as we then explained, to have two rates on coal from one mining district, nevertheless as the Big Vein coal was not shown to require any reduction in rates, but was said to be moving freely in competition with the other coals, and as the issue made on the complaint was directed against the rates on Small Vein coal only, we concluded, without committing ourselves to the general propriety of two rates from one district and basing our action strictly on the record before us, to order a reduction in rates on Small Vein coal to tide water points, so as to permit that coal to meet the competition of coals of like quality from the Pennsylvania and West Virginia fields. We thereupon entered such an order without disturbing the rates on Big Vein coal and the lower rates on Small Vein coal were subsequently published by the defendants in that complaint. But we said in explanation of our exact attitude toward the whole situation that: 'If the results are such as to demonstrate that the two rates cannot be successfully maintained without giving rise to discriminations and unlawful practices, the question will then arise whether the lower rate should not be made effective from all mines in the basin, whether producing Big Vein or Small Vein coal. And it may be well also now to emphasize the fact that this disposition of the matter is not to be understood as an approval of such a rate adjustment either for general application or as controlling our action in the future in case complaint should be made of the rate on water-borne coal from the Big Vein mines. We are to be understood only as giving recognition, on the record before us, to the right of the Small Vein operators to have a rate that will enable them to move their output to the consuming markets and give them a reasonable opportunity to compete with similar coal from adjacent fields moving through Cumberland to tide water for destinations inside and outside the Capes.'"

Accordingly, the rate on Small Vein coal from George's Creek basin was made uniform with that from the Pennsylvania and West Virginia fields. Subsequently the proceeding in the present case was brought on behalf of companies in the George's Creek basin engaged in the mining of both Big Vein and Small Vein coal, and two forms of relief were sought, viz.: In the case of the Big Vein coal:

"That the differentials of 10 and 15 cents a ton against the Big Vein coal constitute an undue discrimination that ought to be removed, and that the Big Vein coal ought to be placed on a parity with the Small Vein coal and with the coals from the Pennsylvania and West Virginia fields."

And in the case of both the Big Vein and the Small Vein coals of George's Creek basin, that they be removed from their grouping with the Pennsylvania and West Virginia fields, viz.:

"(2) That, as the George's Creek basin is nearer to tide water than the Pennsylvania and West Virginia fields, and the haul less expensive both on account of the shorter mileage and on account of the more favorable character of the grades, the rates from these mines to all points on the lines of the defendants should be less than the rates from the more distant western mines with which the mines of the George's Creek basin are now grouped for rate-making railroads."

The relief by way of regrouping was denied, and, while that question is not before us, it is helpful to an understanding of the present case to note that the Commission say:

"While we are not disposed to criticise the desire on the part of the operators at George's Creek to secure better rates than their competitors in the other two fields enjoy, we are not inclined, on the other hand, to yield to

their demand. There are many coal groups that are much more extensive than this group. Moreover, it has been our understanding that group rates, particularly on such a commodity as coal, are advantageous to the public, the carriers, and the mineowners alike. The disrupting of this group of coal-producing districts and coal-consuming destinations after it has been in effect for so many years could not fail to lead to a widespread confusion in coal rates, and we see nothing in the record to justify such an order."

As to the other relief sought, viz., putting Big Vein coal on an equality with all the other coals in this group, the report shows not only that there was the all-sufficient ground we have noted above, viz.; that there was a dissimilarity of charge for similarity of service, but that, wholly apart from the legal ground, there was a practical commercial reason for relief in the increased cost of mining due to drawing pillars, greater water troubles, longer haulage, lumbering, etc., incident to the exhaustion of a very thick vein. The report then states:

"The report of the Commission in the previous proceeding indicates the action that might fairly be anticipated whenever the question of the reasonableness of the rates on Big Vein coal, when water-borne to points inside or outside the Capes, was properly presented to us accompanied by adequate proof that the differentials against it operated to its disadvantage. Such a complaint is now before us, and the testimony makes it quite clear that the reduction in the rates on Small Vein coal required under our order in the previous case ought now to be extended to the rates on Big Vein coal."

Indeed, an examination of this case in all its bearings satisfies us not only that the Commission did not act unlawfully, but was constrained to order the enforcement of a uniform rate in the whole group in accordance with the provisions above quoted from section 15 of the act.

We are therefore of opinion the demurrer should be sustained and the bill dismissed.

It remains to consider an argument peculiar to the Pennsylvania Railroad advanced at the hearing. It was, in effect, said that as the lines of that railroad enter the George's Creek basin only, and do not enter the West Virginia and Pennsylvania fields, the order will subject it to pains and penalties should the Baltimore & Ohio hereafter change its rates from the West Virginia and Pennsylvania fields. It suffices to say that such danger is too remote to invoke injunctive relief, and that, if any such construction is placed upon the order as is now suggested, there will be opportunity to that road to apply to the Commission for modification of the order, or to this court for injunctive relief.