### UNITED STATES v. MYATT.

(District Court, E. D. North Carolina. March 3, 1920.)

Indictment and information ⊂⟹140(1)—Indictment for food profiteering held not subject to motion to quash.

An indictment charging defendant with having, while the United States was at war, knowingly sold sugar at retail at 14 cents per pound, at a profit to himself of 4 cents per pound, in violation of Food Conservation Act, § 4 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛ff), as amended by Act Oct. 22, 1919, c. 80, § 2, 41 Stat. 298, making it unlawful "to make any unjust or unreasonable rate or charge in handling, dealing in or with any necessaries," in the absence of any regulation by the President fixing a reasonable charge or price at which sugar may be sold at retail at the place of the alleged offense, *held* to involve the investigation of so many questions of fact to determine a just and reasonable price that it should not be disposed of on motion, but only after full trial.

Criminal prosecution by the United States against W. A. Myatt. On motion to quash indictment. Denied.

E. F. Aydlett, U. S. Dist. Atty., of Elizabeth City, N. C.
J. H. Pou, of Raleigh, N. C., for defendant.

CONNOR, District Judge. The grand jury returned a bill of indictment in which it presented that defendant, on December 20, 1919—

"while doing business as a retail grocer in the city of Raleigh and during the existence of a state of war involving the United States, and while the United States was at war with Imperial Germany and Austria-Hungary, the said W. A. Myatt knowingly, unlawfully, and willfully, in handling and dealing in certain necessaries, to wit, granulated sugar, did make an unjust and unreasonable charge; that is to say, the said W. A. Myatt did then and there as such retail grocer or dealer charge and sell to Albert L. Cox and T. B. Parker, and other persons to the jurors unknown, a quantity of sugar, to wit, 20 pounds or more of such sugar, and other quantities of such sugar, both larger and smaller, than 20 pounds, at the price of 14 cents per pound, at a profit to himself of 4 cents a pound; that defendant purchased such sugar at a fraction under 10 cents per pound from the American Sugar Refining Company; that defendant well knew that the rate or charge which he made for such sugar was unjust and unreasonable under the act of Congress approved August 10, 1917 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115⅛e–3115⅛mm], entitled 'An act to provide further for the national security and defense by encouraging the production, conserving the supply, and controlling the distribution of food products and fuel,' and as amended by the act of Congress approved October 22, 1919 [41 Stat. 298], entitled 'An act to further provide for the production, conserving and supply of food and fuel.' "

The indictment contained a second count charging a conspiracy, with other persons to the jurors unknown to make an unjust and unreasonable charge for sugar. The district attorney stated that he would not be able to produce any testimony to sustain this count and was permitted to enter a nol. pros. thereto.

Defendant, before pleading and in apt time, filed a motion in writing to quash the bill of indictment for that—

"the matters and things therein alleged do not constitute a violation of any statute of the United States, and particularly do not constitute a violation of section 4 of the act of Congress approved August 10, 1917, entitled, etc.; that the defendant further says that he does not control any such instrumentality of trade as is entitled to make a rate or charge, but that he was a retail grocer and dealer selling goods upon the open market and was not a refiner or an importer of sugar, nor did he operate a warehouse, elevator, or any other instrumentality or convenience of trade which enabled him to prescribe a rate or charge. He further says that he is advised and verily believes that it is not a violation of the said fourth section of the said act of Congress for a merchant to sell goods for such prices as are current and usual in the market when the same are sold."

At the same term of the court, the grand jury returned five other indictments against retail dealers in Raleigh charging violation of the act of Congress, by making unjust and unreasonable charges for sugar. Each of the defendants filed motions to quash the indictment for the same cause. In the argument of the motion, counsel joined in the statement that their clients and other retail dealers in the city of Raleigh were uncertain and without advice in regard to the price at which they were entitled to sell sugar at retail, without violating the statutes; that some of the defendants had ordered and had in course of transportation sugar to supply the necessities of their customers, and were uncertain whether they could, with safety, deal in or handle it; that they desired to conform to the law, but were unable to secure advice upon which they could safely conduct business. They requested the court, without regard to the conclusion reached upon the motion, so far as it was proper and in accordance with the course and practice to do so, to advise them in respect to their right and duty, as citizens desiring to obey the law. While, of course, any conclusion reached, or any opinion expressed, by the court in these, or similar cases, would be subject to review, the situation in which the defendants are placed is appreciated and their request would seem to be reasonable. Experience demonstrates the wisdom of the maxim of Sir Edward Coke that "certainty is the mother of quietness and repose" and of the observation of Mr. Livingston that "penal laws should be written in plain language, clearly and unequivocally expressed, that they may be neither misunderstood nor perverted."

While it is of importance to the public welfare that those who deal in the necessaries of life should not, if so disposed, in time of war, famine, or scarcity, be permitted to demand extortionate prices, or hoard or monopolize food, fuel, and other necessaries, it is of equal importance for securing a fair supply for the people that the law should not be so uncertain in its provisions, and drastic in demands upon honest men as to endanger their liberty and property or prevent a free, open, competitive market for the necessaries of life. The court cannot assume that Congress either desired or intended to bring about such a result. If statutes are uncertain and obscure in their terms, as is suggested and as they frequently are, the remedy must be found by an appeal to the law-making department and not by strained or hypercritical construction by the courts.

For the purpose of disposing of the motion to quash the indictment-ment an analysis 'of the sections of the statute upon which the bill is drawn must be made. The challenge made by the motion is that, conceding that defendant did the act charged, it does not come within or violate any of the prohibitions found in the statute. It is conceded that defendant's liability to be held to plead to the bill is dependent upon the construction of the fourth section of the original statute as amended by the act of October 22, 1919. It must be kept in mind that the authority to enact this statute, as recited in its preamble, is found in the "war power" vested in the national government. It assumes, as is necessary to sustain the power to enact it, that this nation is at war with the "German Imperial government." It is equally true that, while of necessity it is difficult to define and place limitations upon the "war power," it is an elementary truth that the Constitution is the supreme law, fixing the limit of power of the government, and protecting the right of the citizen "equally in war and in peace, and covers with its shield of protection all classes of men, at all times and under all circumstances."

It is also true that courts should not indulge in hypercritical construction of the language found in indictments, for the purpose of destroying them and hindering the government in its investigation of alleged violation of statutes. Bills of indictment will not be quashed upon suggestions of mere technical objection but only, when, upon a fair and reasonable interpretation, they fail to aver an indictable offense, or to describe with reasonable certainty the offense intended to be charged. With these elementary rules in mind, an examination of the language of the statute and the indictment will enable us to reach a conclusion upon the merits of the motion to quash this bill.

The act of August 10, 1917, recites the existence of a state of war, and for its successful prosecution and support and the maintenance of the army and navy the necessity for an adequate supply and equitable distribution of foods, wearing apparel, and other necessaries, and to prevent, locally and generally, scarcity, monopolization, hoarding, injurious speculation, manipulation, and private control, affecting such supply, etc., and to establish and maintain governmental control of such necessaries during the war, the statute is enacted. The President is authorized to make such regulations, and to issue such orders, as are essentially effective to carry out the provisions of the act.

By section 4 it is made unlawful: (1) For any person willfully to destroy any necessaries for the purpose of enhancing the price or restricting the supply thereof; (2) knowingly to commit waste or willfully to permit preventable deterioration of any necessaries; (3) to hoard, as defined in section 6 of the act any necessaries; (4) to monopolize or attempt to monopolize any necessaries; (5) to engage in any discriminatory and unfair or any deceptive or wasteful practice or device; or (6) *to make any unjust or unreasonable rate or charge in handling, dealing in, or with, any necessaries.*

It will be observed that the foregoing prohibited acts may be committed by "any person." The remaining clause of the section makes

it "unlawful to conspire, combine, agree or arrange with any other person" to do either of the things prohibited, of which the last class is *"to exact excessive prices for any necessaries."* The defendant is not charged with a violation of this clause of the section. There is, in section 4, no provision making the doing of any of the prohibited acts, or conspiring to do them, indictable, nor imposing any penalty, fine, or other punishment therefor.

Section 5 empowers the President, in his discretion, or when he finds it essential, to license the importation, manufacture, storage, mining, or distribution of any necessaries to carry into effect any of the purposes of the act, to publicly so announce. After the date fixed in such announcement no person may carry on any business specified in the announcement, unless he shall secure or hold such license. Whenever the President shall find any storage, charge, profit, commission, or practice is unjust or unreasonable, the holder of such license may be ordered to discontinue the same, and unless such license, by an order reciting the facts, is suspended or revoked, such licensee shall, within the time prescribed in the order, discontinue such unjust, unreasonable, or otherwise unlawful practice. The President may, in lieu of any such unjust, unreasonable, or otherwise unlawful storage charge, profit, or other practice, find what is a just, reasonable, or otherwise lawful storage charge or profit, and such order shall, in any proceeding brought in any court, be prima facie evidence. Any person who, without a license issued pursuant to this section, or whose license shall have been revoked, knowingly carries on any business for which such license is required, or who willfully fails to discontinue such unjust, unreasonable, or other unlawful storage charge, profit, etc., shall, upon conviction, be punished by a fine not exceeding $5,000, or by imprisonment not exceeding two years, or both. Certain well-known persons and classes of persons are excepted from the provisions of this section.

Section 6 prescribes a fine or imprisonment, or both, for hoarding any necessaries, defining what acts shall be deemed hoarding within the meaning of the act. Section 8 prescribes like punishment for willful destruction of any necessaries. Section 9 prescribes heavy punishments for entering into a conspiracy to do the prohibited acts. It is conceded that no other of the several sections of the act have any relation to or affect the defendant, in respect to this indictment or the motion to quash.

It is clearly charged in the bill that the defendant was, at the time of doing the act charged as a violation of the statute, a retail dealer within the meaning of the act. The act of October 22, 1919, amends the act of August 10, 1917, by re-enacting section 1, omitting sections 2 and 3, and amending section 4. As amended, section 4 contains the identical language found in the original act, so far as it applies to the act charged as unlawful by the defendant. It is amended by adding the following:

"Any person violating any of the provisions of this section upon conviction thereof shall be fined not exceeding $5,000 or be imprisoned for not more than two years or both."

The validity of the indictment against the defendant must therefore be determined by reference to the provisions of section 4 of the original act, as amended. Sections 6, 8, and 9 of the act of August 10, 1917, are repealed by the act of October 22, 1919, and a like punishment prescribed by the amendment to section 4, as prescribed in said sections.

For the purpose of ascertaining the extent and manner in which the President has, pursuant to the authority vested in him by the act of August 10, 1917, taken action, it will be well to note the several proclamations made regarding the manufacture, importation, and distribution of sugar. On September 7, 1917, he issued his proclamation (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛g), reciting the provisions of the statute and requiring "all * * * firms, corporations and associations engaged in the business either of importing sugar, or manufacturing sugar from sugar cane or beets, or of refining sugar or of manufacturing sugar, syrups or molasses," to secure a license issued under such rules and regulations governing the conduct of the business as should be prescribed. All persons coming within the scope of the proclamation are notified that, for failing to comply therewith, they will "be liable to the penalties prescribed by the act of Congress."

The President, pursuant to the provisions of the several acts of Congress and for the purposes recited, issued a number of proclamations and executive orders regulating the manner in which certain necessaries, included in said acts and specified in such proclamations, should be manufactured, produced, sold, and distributed, all of which are compiled and published in Public Documents Nos. 40, 41, and 243 by W. Ray Loomis. None of these proclamations or orders fix any rate or charge which retail dealers are permitted to make in handling or dealing in sugar. No reference to such proclamations, orders, or regulations is made in the bill of indictment. It seems that the regulation of the importation, distribution, and sale of sugar, so far as the same were regulated, otherwise than by the proclamation of September 7, 1917, requiring importers and manufacturers to secure licenses, were intrusted to the United States Sugar Equalization Board. This board, the President is, by the act of December 31, 1919, authorized to continue until December 20, 1920. The provisions of section 5 and section 10 of the act of August 10, 1917, "as far as they relate to raw or refined sugar, syrups or molasses, are continued in force until December 31, 1920, notwithstanding the provisions of section 24 of said act." These sections have no relevancy to the charge made in this bill.

The contention made by defendant upon his motion to quash the indictment is based upon the proposition that, conceding every averment therein to be true, the sale by him as a retail dealer of sugar at 14 cents a pound is not declared unlawful; that the conduct ascribed to him is not within either the words or the spirit of the statute. It is conceded that none of the acts declared to be unlawful by section 4 of the act of August 10, 1917, include a sale of sugar, unless the

words "to make an unjust or unreasonable rate or charge, in handling or dealing in, or with, any necessaries" does so. While the alleged unlawful conduct is confined to this language, other portions of the statute may be examined for the purpose of reaching a construction of the terms of the section in controversy. The statute must be construed as an entire plan or scheme of Congress relating to the subject with which it is undertaking to deal, as expressed in the title or preamble.

It will be observed that the first act declared by section 4 to be unlawful, destroying any necessaries, is made to depend upon the "purpose of enhancing the price or restricting the supply thereof." While these words are not used in defining the other acts or conduct declared to be unlawful, such as committing waste, hoarding, monopolizing, engaging in discriminating or unfair practice, or making an unjust or unreasonable rate or charge, a fair and reasonable construction of the entire section would make the purpose or intent an essential element in the unlawful character of each of them. This is consistent with the purpose which Congress had in passing the statute—to promote the national security and defense, the successful prosecution of the war, the support and maintenance of the army and navy, to assure an adequate supply and equitable distribution of food and other supplies necessary to the mobilization of the resources of the nation. It is in these purposes and for these ends that the power is found in Congress to enact the statute. The charge against defendant, therefore, is that, for the purpose of enhancing the price of sugar, he made an unjust and unreasonable rate or charge. For the purpose of this discussion, we may eliminate the word "unjust," in the absence of any standard for comparing defendant's conduct with any prescribed standard of legal justice.

Defendant insists that the word "charge," as used in the statute, does not mean or connote price or amount for which sugar is sold. An examination of dictionaries and decided cases discloses the fact that "charge" is a word of very general and varied use. Webster gives it 13 different meanings. The Dictionary of the Philological Society gives it 20 separate principal definitions, besides a nearly equal number of subordinate variations of meanings. Reese v. Pennsylvania R. R. Co., 131 Pa. 422, 19 Atl. 72, 6 L. R. A. 529, 17 Am. St. Rep. 818. Among the definitions given, the tenth in order is:

"The price required or demanded for service rendered (or, less usually) for goods supplied."

The industry of counsel discloses a very large range of definitions producing doubt as to what was in the mind of the draftsman when he used the word in the statute. 5 Am. & Eng. Enc. 885; 11 Corpus Juris, 290, 291. As a verb "to charge" signifies:

"To put upon as a task or duty; to overload; to burden; to commission for a certain purpose; to intrust; to lay upon as a duty or task; to require or demand by a carrier of a shipper as of right, certain compensation for the transportation of freight—or an insurance company a fixed amount for insuring life or property—an exaction or demand which must be met," etc.

Without pursuing the inquiry further, probably leading only to further confusion of thought, for the purpose of disposing of this motion, the conclusion is reached, not without difficulty, that an allowable definition of the word, as used in the statute, includes the making or demand of a price or sum of money for an article offered for sale, for the purpose of enhancing the price thereof.

It is insisted that, conceding that the word "charge" may be so used in a statute as to indicate the purpose in the mind of the Legislature to prohibit or place restrictions upon the price or sum of money asked or demanded for an article, reference to the general scope of the act of August 10, 1917, indicates that the prohibition to "make an * * * unreasonable rate or charge, in handling or dealing in or with any necessaries" relates to methods, plans, or schemes for distribution, transportation, etc. That the primary danger which confronted the government in providing for the support of the army and navy during the war was interference with, restriction upon, or making unreasonable rates or charges for, the transportation or distribution, sending to large army encampments, or to the army overseas, food, fuel, etc., essential to its maintenance and supplying the large numbers of employés in civil stations engaged in work for the government.

It is insisted that this is evidenced by the provisions made for licensing only those who were engaged in the "importation, manufacture, storage, mining, or distribution of any necessaries." Power is conferred upon the President, whenever he shall find that any storage charge, commission, or profit or practice of any licensee is unjust or unreasonable, discriminatory, and unfair or wasteful, he may order the "discontinuance of the same." He may, in lieu of such charges, etc., "find" what is a just, reasonable, nondiscriminatory, and fair storage charge, commission, profit, or practice. There is a proviso defining a retail dealer as one not engaged in the wholesale business, whose gross sales do not exceed $100,000 per annum. It is significant that neither of the words "price" or "profit" is found in either of the prohibited acts which may be committed by a single person, whereas in the clause of section 4, prohibiting combinations or conspiracies, we find the prohibition to combine "to exact excessive prices for any necessaries."

It is further noted that by section 11 the President is authorized to purchase, store, etc., and to sell for cash at reasonable prices, certain necessaries, not including sugar: Provided that, if any minimum price shall have been theretofore fixed pursuant to section 14 of the act, then the price paid shall not be less than such minimum price. Section 14 authorized the President to fix a "reasonable guaranteed price for wheat in order to assure to the producers a reasonable profit." Section 13 provides a plan by which the President may prescribe such rules and regulations as he may deem necessary to prevent "injurious speculation in, or in order to prevent unjust market manipulation or unfair and misleading market quotations of the prices of, necessaries," etc. Any person willfully violating any regulation

made pursuant to this section shall be punished by a heavy fine or imprisonment, or both. Power is given the President to fix the price of coal, coke, etc.

The act contains 27 sections, many of which cover a multitude of subjects and plans, for regulation of methods of production and distribution. It is neither necessary nor practicable to discuss the many prohibitions and regulations prescribed, because the district attorney has, with commendable fairness, by specifying the act which is deemed to subject the defendant to the pains and penalties prescribed by the statute, confined the charge to the sale of sugar, which cost him a fraction less than 10 cents, for 14 cents. In the ultimate disposition of the case, assuming pro hac vice that the proof establishes the substantive fact as alleged, the liability of the defendant must depend upon the finding, upon competent testimony, aliunde, any rules, orders, standards, or rates fixed or prescribed by any department, agency, or board, that such charge made or price demanded was, under the circumstances and conditions found to exist, "unreasonable" and made for "the purpose of enhancing the price of sugar" beyond a fair, reasonable price in the quantity, at the time, place, and under the conditions existing and relating to such sale. I do not find in the statute, where alone it must be found, if it exists, any power vested in any other officer than the President "to make such rules and regulations and issue such orders as are essential to carry out the provisions of the act."

The district attorney, in the indictment and his argument, does not suggest that the President has made any regulation or issued any order fixing or prescribing a just or reasonable charge or price at which a retail dealer in the city of Raleigh, at any date subsequent to the ratification of the amendatory act of October 22, 1919, and the finding of the bill, may sell sugar. It is manifest, therefore, the indictment which specifies the act of which complaint is made and charged to be unlawful does not enable the court, by applying any statutory standard to find such act to be unlawful. If the sale of sugar by defendant as alleged in the bill is unlawful, it must be because such sale violates some statute enacted by Congress. The Executive Department, and its executive or administrative agencies, may, when so empowered, make rules and regulations in the administration of statutes and fix rates which are prima facie reasonable; but they cannot make laws, nor impose punishments upon the citizens. The people, the source of all governmental power, have not conferred upon the Executive Department this power. The Judicial Department, when its powers and duties are invoked, is confined to the enforcement of the statute as enacted by Congress.

The argument made to sustain the motion which attacks the validity of this indictment is that it fails to advise or inform the court of the commission of any act which enables the court to adjudge, as matter of law, defendant guilty of an indictable offense; that the court cannot, from the indictment, find that a sale of sugar by defendant, as alleged, is unlawful. To this objection it is said that, by making

a sale of sugar at the price charged, defendant "made an unjust and unreasonable" price or charge for the purpose of enhancing the price of sugar, and this is declared by the statute to be unlawful. It will be observed that the statute does not declare it unlawful to make an unjust or unreasonable *profit* upon sugar. The profit made is not the test, and may be entirely irrelevant to the guilt of the defendant. He may, within the language of the statute, make an unreasonable and therefore unlawful, "rate or charge" without making any profit, or the rate or charge made may involve a loss to him upon the purchasing price. It is argued that a penal statute which fails to fix or provide a legal standard by which the citizen may be informed how he may, with safety, conduct his lawful business or delegate the power to fix the standard, is void for uncertainty. The clause in section 4, which defendant is charged with violating, is in the identical words found in the Interstate Commerce Act—Comp. St. § 8563(3)—which declares that—

"All charges made for" service by carriers must "be reasonable and just. * * * Every unjust and unreasonable charge is prohibited and declared to be unlawful."

This statute has been frequently construed and its provisions enforced by the courts in civil suits. The imposition of civil duties and liabilities, measured by the "rule of reason," permeates almost every phase of commercial, industrial, social, and economic life. For a long period the courts held that what was reasonable—such as reasonable care, time, reasonable doubt, etc.—was a question of law, to be laid down as a binding rule to be applied to the facts as found by the jury. The general rule, now followed by federal courts, leaves the ultimate decision of the question, under instruction by the court, to the jury, unless upon the uncontradicted evidence the inference is so free from doubt that men of fair intelligence would not differ as to the correct conclusion. The standard usually fixed for the guidance of men who are required to live up to the rule of reason is the conduct, under similar conditions, of the ideal prudent man. Such, I assume, would be the standard by which the court would ascertain whether the defendant has made an unjust or unreasonable charge for sugar for the purpose of enhancing the price.

Discussing the question as it applied to railroad rates, Judge Peckham said:

"The subject of what is a reasonable rate is attended with great uncertainty. What is a proper standard by which to judge the fact of reasonable rates? Must the rate be so high as to enable the return for the whole business done to amount to a sum sufficient to afford the shareholder a fair and reasonable profit upon his investment? If so, what is a fair and reasonable profit? That depends upon the risk incurred, and the rule itself differs in different localities. * * * Is the reasonableness of the charge to be tested by reference to the charges for the transportation of the same kind of property made by other roads similarly situated? * * * It is quite apparent, therefore, that it is exceedingly difficult to formulate even the terms of the rule; * * * while even after the standard should be determined there is such an infinite variety of facts entering into the question of what is a reasonable rate, no matter what standard is adopted, that any individual shipper would in most

cases be apt to abandon the effort to show the unreasonable character of a charge." United States 'v. Freight Ass'n, 166 U. S. 331, 17 Sup. Ct. 555, 41 L. Ed. 1007.

The value of these reflections is emphasized by the fact that the learned justice was dealing with the terms used in the Interstate Commerce Act, which are, as noted, identical with this statute. In Smyth v. Ames, 171 U. S. 361, 18 Sup. Ct. 888, 43 L. Ed. 197, Judge Harlan says:

"Of course, the unreasonableness of a schedule of rates must be determined by the facts as they exist when it is sought to put such rates into operation."

In Atlantic Tel. Co. v. Philadelphia, 190 U. S. 160, 23 Sup. Ct. 817, 47 L. Ed. 995, the question was whether the rate made by the city was reasonable. The court said:

"What is reasonable in one municipality may be oppressive and unreasonable in another. 'In determining this question the court will have to regard all the circumstances of the particular city or corporation, the object sought to be attained, and the necessity which exists for the ordinance. Regulations proper for a large and prosperous city might be absurd or oppressive in a small and sparsely populated town.'"

In Willcox v. Consolidated Gas Co., 212 U. S. 19, 48, 29 Sup. Ct. 192, 198 (53 L. Ed. 382, 15 Ann. Cas. 1034, 48 L. R. A. [N. S.] 1134), it is said:

"There is no particular rate of compensation which must, in all cases and in all parts of the country, be regarded as sufficient for capital invested in business enterprises. Such compensation must depend greatly upon circumstances and locality * * * where its business is conducted, and the rate expected and usually realized there upon investments of a somewhat similar character. * * * There may be other matters which in some cases might also be properly taken into account in determining the rate which an investor might properly expect or hope to receive, and which he would be entitled to without legislative interference."

To the same effect the courts have spoken in other cases, in which they have been called upon to find whether rates or charges made by public utility corporations were unjust or unreasonable. Because of the difficulty in dealing with the question, resulting from the variety of conditions and the danger of doing injustice, the courts have been liberal in administering the rules of evidence, desiring to have all of the light possible. Experience has demonstrated the wisdom of committing to trained and experienced men on boards or commissions the duty of fixing reasonable rates or charges in respect to those public or quasi public agencies coming within governmental control. Such rates are prima facie reasonable, but subject to be reviewed by the courts. The reasonableness of the charge made for sugar by defendant, under the circumstances as they shall be found to exist, will depend upon many factors—time, place, quantity, cost of conducting business, taxes, rents, market conditions, current prices charged in the same market, etc. Liability to indictment cannot be fixed by any rule, rate, price, or profit made by any executive officer or agency. It

must be fixed after a full hearing in an open public trial, conducted according to the rules of law and evidence, before a court composed of a judge and jury, each performing its appropriate, constitutional function—this, and this only, is due process of law, by which alone criminal liability can be fixed upon a citizen. This is the right of the government and the citizen alike.

While there lurks in the statute, and therefore in the bill of indictment, uncertainty and obscurity, I am of the opinion that according to the better practice the motion to quash should be denied, and defendant plead to the bill, to the end that a trial of the issue be had, etc. I note that a District Judge in Missouri has, after hearing the evidence in a prosecution under this statute held that, because of its uncertainty, the defendant could not be convicted and dismissed the indictment.

I have, at unusual length and freedom, discussed the question raised by the pleadings, because of the request of counsel and the interest naturally felt by those who buy and those who sell the necessaries of life. I indulge the further liberty of referring with satisfaction to the patriotic spirit expressed in their conduct, which has existed among the people of this district during the war. But one prosecution has been brought to trial for violation of the Espionage Act, and that not of an aggravated character—the expression of an exaggerated self-importance, rather than deep-seated hostility to the government. In no case was there found any actual willful refusal to respond to the Selective Service Act. I attribute this happy condition as much to the fine judgment, common sense, thorough acquaintance with the people, and understanding knowledge of their ways of thought, and patience, on the part of the district attorneys and the marshal and his deputies, as to the loyalty and patriotism of the people and their willing submission and obedience to the law.

The administration of the law regarding the conservation of food, by the patriotic and intelligent citizen, who has served without compensation, and those citizens who have assisted him in the effort to secure fair prices for the necessaries of life, has usually met with a cheerful compliance securing satisfactory results. This is the first indictment for violation of the act returned into this court. Happily the conditions which call for the enactment of the war statutes will soon pass away, and the hope is indulged by all patriotic citizens that normal conditions will soon be restored.

I conceive that courts, especially federal courts, in administering new statutes, under disturbed public conditions, not known to or understood by the people, should keep in view the truth that it is more important to excite and maintain a lively interest in, and cheerful obedience to, the requirements of such laws, than to secure large number of convictions and impose heavy and severe punishments.