Argued and submitted October 9, 1992, rule held valid May 19, 1993

# GTE NORTHWEST INCORPORATED
and Pacific Northwest Bell Telephone Company,
dba U S West Communications,
*Petitioners,*

*v.*

# PUBLIC UTILITY COMMISSION
OF OREGON,
*Respondent.*

(88-954; CA A71751)

852 P2d 918

Mary Burns Tomlinson, U S West Communications, Inc., Portland, argued the cause and filed the brief for petitioner Pacific Northwest Bell Telephone Company.

James M. Brown, Salem, argued the cause for petitioner GTE Northwest Incorporated. With him on the brief was Enfield, Guimond & Brown, Salem.

Keith Kutler, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Charles S. Crookham, Attorney General, Virginia L. Linder, Solicitor General, and Robert M. Atkinson, Assistant Attorney General, Salem.

Before Richardson, Chief Judge, and Deits and Riggs,* Judges.

RIGGS, J.

---

* Riggs, J., *vice* Durham, J.

## RIGGS, J.

Petitioners are "telecommunications public utilities," subject to regulation by the Public Utility Commission (PUC). They brought this proceeding under ORS 183.400 to challenge portions of the PUC rule codified at OAR 860-27-052.[1] In various respects, they argue that the rule is contrary to statutory requirements, exceeds the agency's regulation authority and is unconstitutional. The rule requires certain

[1] Although the arguments made by the two petitioners and the parts of the rule they each challenge are not identical, their contentions that require discussion are materially similar. Consequently, we will not differentiate between petitioners or their arguments in the balance of this opinion.

The parts of the rule that they challenge provide:

"(1) As used in this rule:

"* * * * *

"(b) 'Asset' means any tangible or intangible property of a telecommunications public utility or other right, entitlement, business opportunity, or other thing of value to which a telecommunications public utility holds claim.

"* * * * *

"(3) Regulated and nonregulated intrastate activities of a telecommunications public utility shall be accounted for in accordance with FCC Part 32 - Uniform System of Accounts, but with the following exception. For intrastate purposes, Part 32 rules governing affiliate transactions (Sections 32.27(a), (b), (c), and (d)) are replaced as follows:

"(a) When an asset is transferred to regulated accounts from nonregulated accounts, the transfer shall be recorded in regulated accounts at the lower of net book value or fair market value.

"(b) When an asset is transferred from regulated accounts to nonregulated accounts, the transfer shall be recorded in regulated accounts at the tariff rate if an appropriate tariff is on file with the Commission. If no tariff is applicable, proceeds from the transfer shall be recorded in regulated accounts at the higher of net book value or fair market value.

"(c) When an asset is transferred from a regulated account to a nonregulated account at a fair market value that is greater than net book value, the difference shall be considered a gain to the regulated activity. The telecommunications public utility shall record the gain in a manner which will enable the Commission to determine the proper disposition of the gain in a subsequent rate proceeding.

"(d) When services or supplies are sold by a regulated activity to a nonregulated activity, sales shall be recorded in regulated revenue accounts at tariffed rates if an applicable tariff is on file with the Commission. Tariffed rates shall be established whenever possible. If services or supplies are not sold pursuant to a tariff, sales shall be recorded in regulated revenue accounts at the utility's cost.

"(e) When services or supplies are sold to a regulated activity by a nonregulated activity, sales shall be recorded in regulated accounts at the nonregulated activity's cost or the market rate, whichever is lower. The nonregulated activity's cost shall be calculated using the telecommunications public utility's most recently authorized rate of return."

accounting treatment by the utilities with respect to transactions with their affiliates.[2] As explained in PUC's brief, the essential mechanism of the rule — although not the exclusive one — is that "purchases by the utility must be recorded at the lower of cost or market price while sales must be recorded at the greater of cost or market price."

The objective of the rule is to prevent "cross-subsidization," by which intracorporate transfers are artificially inflated or deflated and can thereby be reflected in the rate structure at figures that do not accurately reflect the cost to or gain by the utilities, the affiliates or their common owners. An example of cross-subsidization is given in PUC's brief:

"[S]uppose a utility can buy a widget for $2, but instead its affiliate buys the widget for $2 and 'sells' it to its affiliated utility for $3. If the utility had purchased the widget on the open market, it would be entitled to an opportunity to recover its $2 investment in rates it charges its * * * customers. Because the utility 'spent' $3 for the widget, however, it may seek to recover $3 in its rates. If successful, the utility will be able to charge higher rates, with the extra profit going to its shareholders while its customers pay $3 for a $2 item."

Beyond the broad general rulemaking authority that PUC enjoys under ORS 756.060, it relies on two specific statutes as authority for the challenged provisions. ORS 759.120 provides:

"(1) Every telecommunications utility shall keep and render to the commission, in the manner and form prescribed by the commission, uniform accounts of all business transacted. All forms of accounts which may be prescribed by the commission shall conform as nearly as practicable to similar forms prescribed by federal authority.

---

[2] OAR 860-27-052(1)(a) provides:

"(a) 'Affiliate Transaction' means a transfer of assets, a sale of supplies, or a sale of services between accounts for regulated activities of a telecommunications public utility and accounts for nonregulated activities of a separate entity which is either an affiliated interest or another company in which the utility owns a controlling interest. It also means a transfer of assets, a sale of supplies, or a sale of services between accounts for the regulated and nonregulated activities of a single telecommunications public utility."

"(2)   Every telecommunications utility engaged directly or indirectly in any other business than that of a telecommunications utility shall, if required by the commission, keep and render separately to the commission, in like manner and form, the accounts of all such other business, in which case all the provisions of this chapter shall apply with like force and effect to the accounts and records of such other business."

ORS 759.030(5) relates to cross-subsidization and provides, in material part:

"No telecommunications utility may use revenues earned from or allocate expenses to that portion of its business which is regulated under this chapter to subsidize activities which are not regulated under this chapter; nor shall the commission require revenues or expenses from any activity not regulated under this chapter to be attributed to the regulated activities of a telecommunications utility."

■      Petitioners argue that the definition of asset in section (1)(b) of the rule and the operation of section (3) have the effect of regulating entities other than the utilities, of regulating activities by the utilities that are outside the scope of PUC's regulatory authority and of regulating the accounting treatment of items that are not involved in the services that are subject to regulation or includable in the rate base. Petitioners' argument is a lengthy one, but it fails for a simple reason: Its premise is wrong. The rule does not govern unregulated entities or activities; rather, it governs the accounting treatment that must be given to intracorporate transactions — or transactions between "regulated and unregulated accounts" — as they affect the cost and gain profile of the regulated activity. That function of the rule is entirely consistent with ORS 759.120.

Petitioners further contend that the rule *causes* cross-subsidies, in violation of ORS 759.030(5), by requiring either the regulated or unregulated account to absorb the shock of accounting entries that are not based on actual dollars spent or received. Petitioners give the example:

"[A]n office building has a fair market value of $500,000 and a book value of $300,000. If [the utility] buys that building from a third party, the acquired asset is entered on [its] books at $500,000. If it buys the same building from an affiliate, the transaction must be recorded at $300,000 which requires the

arbitrary, forced subsidy of $200,000. The affiliate receives full, fair market value but [the utility's] books cannot record $200,000 that the company spent and the shareholders cannot receive any earnings on that portion of their investment. In effect, shareholders' money has been spent without obtaining full value—the transaction has been subsidized. If the OPUC rules are allowed to stand, the only way to protect the shareholders in the transaction would be to purchase the asset from the affiliate at the price established by book value rather than market and force the affiliate to subsidize [the utility's] regulated operation by $200,000. Under either configuration, the result is a violation of the statute's prohibition against subsidies."

◼    The point that that argument misses is that the premise of the rule is that, in the intracorporate transfer context, neither party actually gains or loses, because the two parties are one. Therefore, the "two" can devise accounting practices by which artificial book entries are used that do not reflect actual gains or losses to the buyer and seller but, rather, constitute fictitious numbers that benefit regulated utilities at their customers' expense. It may be true that almost every image has a mirror image and that cases may arise where the result of the rule will be that rates are established that do not provide shareholders with a fair return. If that happens, the time for redress is when and if that occurs. For purposes of this rule challenge, we find no inconsistency between OAR 860-27-052 and ORS 759.030(5). The rule is a reasonable and permissible method for implementing the statute's prohibition of cross-subsidization. *See Southwestern Bell Corp. v. F.C.C.*, 896 F2d 1378 (DC Cir 1990).

Petitioners argue next that the rule gives rise to a taking of shareholder property, by requiring unreal and unfavorable figures to be used in the accounts and, in turn, used in rate calculations. The effect, according to petitioners, is that their shareholders are deprived of their constitutional right to a fair return on their investments. PUC argues, first, that the confiscatory takings issue cannot be considered on the basis of the accounting rule, but can ripen only when there is a rate decision. *See Power Comm'n v. Hope Gas Co.*, 320 US 591, 64 S Ct 281, 88 L Ed 333 (1944).

Be that as it may, what petitioners can offer for their contention in this ORS 183.400 proceeding is extremely

limited. They must establish that the rule will necessarily result in rates that leave investors without a fair return. That argument fails for the same reason that petitioners' other arguments do: it presupposes that they are entitled to a return that is measured against something other than real investments, expenses and profits. As we noted in connection with the previous issue, actual rate decisions could result in a taking that would be redressable at that time, but the rule itself does not.

■■    Petitioners also contend that the inclusion of intangibles and of other items that are not part of the rate base in the definition of "asset" is confiscatory, because shareholders are "entitled to earn a rate of return on the dedication of this property to public use." The argument is circular. If the items are not includable in the rate base valuation, there is no constitutional right to a return on it. *See Willcox v. Consolidated Gas Co.*, 212 US 19, 29 S Ct 192, 53 L Ed 382 (1909). We also find no merit to petitioners' contention that, standing alone, the fact that assets are subject to an accounting requirement can rise to a confiscation or taking of the assets.

Petitioners' remaining assignments and arguments do not warrant discussion.

Rule held valid.